73 N.J. 132 (1977)
373 A.2d 377
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
ISAAC ALLEN, DEFENDANT-RESPONDENT, GANNETT COMPANY, INC. AND THE HOME NEWS PUBLISHING COMPANY, INC., APPELLANTS. STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
JOHN HUGHES AND RICHARD THOMPSON, DEFENDANTS-RESPONDENTS, TRENTON TIMES CORPORATION, APPELLANTS.
The Supreme Court of New Jersey.
Argued October 12, 1976.
Decided April 22, 1977.
*134 Mr. Thomas C. Jamieson, Jr., argued the cause for appellant Trenton Times Corporation (Messrs. Jamieson, McCardell, Moore, Peskin & Spicer, attorneys; Messrs. Williams, Connelly & Califano, of the District of Columbia bar, of counsel; Mr. Jamieson, Mr. Michael F. Spicer and Ms. Frances Goldmark Massie on the brief).
Mr. John H. Yauch, Jr., argued the cause for appellant The Home News Publishing Company, Inc. and Mr. Floyd Abrams, of the New York bar, argued the cause for appellant Gannett Company, Inc. (Messrs. Yauch, Peterpaul and Clark, attorneys; Mr. Yauch, Mr. Abrams, Mr. Eugene R. Scheiman, Mr. Dean Ringel and Mr. Kenneth M. Vittor on the brief).
Mr. Daniel Louis Grossman, Deputy Attorney General, argued the cause for respondent State of New Jersey (Mr. William F. Hyland, Attorney General of New Jersey, attorney; Mr. David S. Baime, Mr. John De Cicco and Mr. Grossman, of counsel and on the brief).
*135 Ms. Kathryn A. Brock, Assistant Deputy Public Defender, argued the cause for defendants-respondents (Mr. Stanley C. Van Ness, Public Defender, attorney; Ms. Brock and Mr. William L. Roughton, Jr., of counsel and on the brief).
Mr. Thomas J. Cafferty argued the cause for amicus curiae New Jersey Press Association (Messrs. Seiffert, Frisch, Gruber & Cafferty, attorneys).
Ms. Annamay T. Shepard and Mr. Frank Askin submitted a brief on behalf of amicus curiae American Civil Liberties Union of New Jersey, Inc. (Mr. Jonathan M. Hyman, of counsel).
The opinion of the court was delivered by SULLIVAN, J.
The two appeals herein, State v. Allen and State v. Hughes and Thompson, although they involve separate and unrelated murder trials, present a common legal issue of fundamental and far-reaching importance to the news media and to the administration of justice.
In State v. Allen the trial court, following the selection of an unsequestered jury[1] and acting at the request of both the prosecutor and defense counsel, ordered:
that publication of inculpatory testimony taken outside the presence of the jury at evidentiary hearings held to determine the admissibility of said testimony which after hearing the court determines it is inadmissible at trial, if any, is prohibited until the jury is sequestered to deliberate its verdict.
The subject matter of the order was an alleged confession by Allen which the State proposed to offer at trial and to which defendant intended to object as inadmissible.
*136 Where the admissibility of State's evidence such as a defendant's confession is challenged at trial, New Jersey follows the usual practice of conducting a hearing, the jury having been removed from the courtroom, at which the issue of admissibility is determined by the trial court. If the proffered evidence is ruled to be admissible, the jury is recalled and the evidence presented to it. If ruled inadmissible, however, the State is barred from using such evidence as part of its case.
The order in question sought to guard against the possibility that although the trial court might rule that the confession was inadmissible the members of the non-sequestered jury, to defendant's prejudice, might nonetheless read or learn about it through news media reports of what transpired at the evidentiary hearing.
Allen was one of three persons charged with armed robbery and felony murder alleged to have been committed in Somerset County. The incident had resulted in massive pre-trial publicity. Separate trials were ordered for each defendant. Allen apparently was the second defendant tried. His trial began in December, 1975, lasted six weeks, and ended in a mistrial when the jury was unable to reach a unanimous verdict. His retrial commenced in February 1976. Prior to entry of the protective order the trial court stated that it was aware of the possible alternatives of sequestration and "carefully worded precautionary instructions" to the jury. It rejected sequestration of the jury for the entire four to six weeks of trial as an unduly harsh and unwarranted burden on jurors which would greatly increase the difficulties in jury selection. It doubted the effectiveness of instructions should the jury learn of inadmissible evidence through press reports. Accordingly, these alternatives were rejected and the order heretofore referred to was entered.
The trial court then proceeded to hold a hearing on defendant's alleged confession, ruled that it was admissible and allowed it to be presented to the jury, the result being that, as a practical matter, the order was inoperative as to *137 anything that took place at trial. Ultimately, Allen was found guilty by jury verdict.
In the meantime, however, two newspapers, whose reporters were attending the trial, sought review of the trial court's order but their application for leave to appeal was denied by the Appellate Division. The same motion was then presented to this Court and was granted, 70 N.J. 153 (1976), our order being entered some two days after the jury verdict.
State v. Hughes and Thompson has a similar factual pattern. Hughes, Thompson and the latter's brother were charged with murder and robbery in Mercer County. The brother was tried separately in 1972 and convicted of first degree murder. Hughes and Thompson were also convicted in 1973 following a lengthy jury trial. However, their convictions were reversed by the Appellate Division because of prejudicial remarks by the prosecutor during summation.
Defendants' retrial began on March 1, 1976 with an unsequestered jury. During the course of the trial, and on March 5, 1976, a restraining order was entered prohibiting a newspaper reporter present at the trial from reporting anything which took place in the courtroom out of the jury's presence. The order was to remain in effect until after the jury had returned a verdict.
Entry of the order grew out of the following circumstances. The State had called as a witness a person who had previously given a written statement which placed Hughes and Thompson at the scene of the crime. A doubt arose as to the testimonial capacity of the witness. It was also indicated that the witness might not testify in accordance with the written statement previously given. Because of the foregoing, the prosecutor requested that the witness be examined out of the presence of the jury. The request was granted and at the same time the trial court, sua sponte, orally charged a newspaper reporter, who was present in the courtroom, not to report anything that transpired out of the presence of the jury until after the jury verdict.
*138 Following a midday recess the witness was recalled to the stand, the jury having been excused. Prior to taking any testimony the trial court, sua sponte, entered a second restrictive order addressed this time to two other newspaper reporters who were in the courtroom. This second order, also orally entered, directed these reporters not to report on what transpired in the courtroom out of the presence of the jury until after the jury verdict. The witness then testified and, inter alia, recanted her written statement. At the close of the hearing the trial court found that she was "high" when she appeared in court, being under the influence of methadone, and that she was incompetent to testify.
On March 5, counsel for the Trenton Times Corporation, two of whose reporters were subject to the restrictive orders, made an in-chambers application to the trial court to have such orders vacated on First Amendment grounds. The application was denied, as was an application to a single judge of the Appellate Division for an emergency stay of the trial court's orders pending disposition of a motion for leave to appeal.
On March 8, 1976 the case was given to the jury. That same day this Court, by order of the Chief Justice, dated March 9 but effective as of March 8, issued a stay of such orders and thereafter, on its own motion, certified and granted Trenton Times' motion for leave to appeal then pending in the Appellate Division. 70 N.J. 153 (1976). On March 9, 1976, the trial court declared a mistrial and discharged the jury which had been unable to agree on a verdict.
Preliminarily, we reject any notion that the appeals before us should be treated as moot and dismissed. The issues are of great public importance and are bound to recur time and again unless and until this Court by its decision determines what a trial court may or may not do regarding news media coverage of a public trial. Nebraska Press Asso. v. Stuart, 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683, 690 *139 (1976). It would be paradoxical to say that the issues had to be viable in the particular case at the time this Court heard or decided them when, by the nature of the judicial proceedings, the trial in question would invariably be concluded before this Court had an opportunity to hear the matter. We therefore determine that the issues are not moot and proceed to the merits.
The narrow issue before us is more easily decided than certain broader questions implicated. In each case the trial court entered orders which restrained the press for fixed periods of time from reporting matters which were to take place in open court. These orders were clearly illegal. Proceedings which take place in open court are matters of public record and the news media has an absolute right to report thereon.
The landmark case of Nebraska Press Asso. v. Stuart, supra, involved the validity of a court order in a murder case which restrained the news media, until a trial jury was empaneled, from publishing or broadcasting accounts of confessions or admissions made by the accused or facts strongly implicating him. The order applied not only to matters adduced at preliminary open court hearings, but also to information gained from other sources.
Insofar as open court hearings were involved, Chief Justice Burger, writing for the United States Supreme Court, held that the press may not be proscribed from reporting events that take place in open court and that once a public hearing is held, reporting of what transpires there may not be restrained. 427 U.S. at 568, 96 S.Ct. at 2807, 49 L.Ed.2d at 703. The Chief Justice went on to discuss the validity of prior restraints as applied to information obtained from sources other than public court proceedings. He noted that the guarantees of freedom of expression under the First Amendment are not absolute and that the Supreme Court has consistently rejected the proposition that a prior restraint can never be employed. He cautioned though that the barriers to prior restraint remain high and the presumption against *140 its use continues intact. The record before the court was then reviewed and it was concluded that, to the extent the order prohibited publication based on information obtained from "other sources," the heavy burden imposed as a condition to securing a prior restraint had not been met. 427 U.S. at 570, 96 S.Ct. at 2808, 49 L.Ed.2d at 704.
That part of the Nebraska decision which struck down the prior restraint against publication of news reports of the case based on information obtained from "other sources" is not directly applicable to the problem before us as the orders herein relate only to the reporting of portions of trial proceedings held in open court. These orders, as heretofore noted, were clearly illegal under the Nebraska declaration that there is an absolute right or privilege to report events that transpire at a public court hearing.
In the recent case of Oklahoma Publishing Co. v. District Court In and For Oklahoma County, Oklahoma, 430 U.S. 308, 97 S.Ct. 1045, 51 L.Ed.2d 355 (decided March 7, 1977), the United States Supreme Court reaffirmed the same declaration by holding that the news media could not be restrained from publishing the name or picture of a juvenile where the name had been learned during court proceedings which were open to the public, including the press, and the photograph taken without objection as the juvenile was being escorted from the courthouse. In overturning the restraining order, the Supreme Court, citing Nebraska, said that the juvenile's name and picture had been publicly revealed and that the news media could not be restrained from publishing this information.
However, this poses the problem as to what a trial court can do to protect a defendant's Sixth Amendment right to a fair trial where, in a trial in which the jury is not sequestered, an issue is presented as to the admissibility of a defendant's confession or other material damaging to the defendant. As noted, the procedure is to remove the jury from the courtroom and then hold a hearing to determine if the evidence *141 should be admitted. Usually these evidentiary hearings are held in open court, and, under the holding of Nebraska, supra, the press has an absolute right to report such open court hearings.
In New Jersey there has been in force since 1972 a Statement of Principles and Guidelines for Reporting of Criminal Procedures approved and adopted by this Court and the New Jersey Press Association. Guideline 5 of this Statement reads as follows:
The Press is free to report any judicial public proceeding, except that any evidence excluded by the court at a hearing outside of the jury's presence shall not be published until after the trial is concluded. The court has the right to hold a portion of the trial outside the presence of a jury. A complete record of the proceedings from which the public has been excluded shall be kept and made available to the public, following completion of the trial, unless otherwise ordered by the court.
Adherence by the press to Guideline 5, supra, would obviate the particular problem here presented. However, the Statement of Principles has no binding effect. Its compulsion is moral and not legal and some members of the press have not always respected it. In one of the cases before us, State v. Hughes and Thompson, the trial court gave as a reason for entering the restraining order its experience of the previous week when the Trenton Times, during a criminal trial, had published a highly prejudicial article about the case requiring the court, at substantial expense to the county and its taxpayers, to sequester the jury for the balance of the trial.
One obvious solution is sequestration of the jury. However, this has its disadvantages. In a protracted trial the cost of providing for a sequestered jury and sheriff's officers can be enormous.[2] Hardship on the jurors must also *142 be considered with the consequent difficulty in jury selection. Further, many defendants are wary of jury sequestration for the reason that the jurors will resent it and hold a defendant responsible for the sequestration order and the resultant inconvenience and hardship to them. Trial judges are under a mandate to avoid jury sequestration except in compelling circumstances. R. 1:8-6.
Another alternative is clear and definitive instructions to the jury not to read or listen to media reports of the trial and to decide the issues only on evidence presented in open court. Realistically, however, in many cases it would be difficult to conclude that a jury could avoid receiving such reports or that such instructions, no matter how forceful, would overcome prejudice to a defendant resulting from the jury learning of a confession or other evidence which the trial court had ruled was inadmissible.
A third alternative that has been suggested is for the trial court, with the consent of the defendant, to hold the evidentiary hearing in camera. See American Bar Ass'n., Standards for Criminal Justice, Fair Trial and Free Press, § 3.5(d) (Approved Draft 1968). By this means the press (as well as the public), being excluded from attendance at such hearing, would be unable to report thereon. However, this poses the further question as to whether, despite a defendant's consent, there would be an unwarranted "interfering with press rights to news sources," if such a hearing were held in camera with the press and public excluded. Nebraska, supra, 427 U.S. at 564, 96 S.Ct. at 2805, 49 L.Ed.2d at 701, n. 8. In Nebraska, the Supreme Court noted the question in the context of the possible closing of pretrial proceedings but, since it was not confronted with this issue, did not pass upon it. Ibid. Justice Brennan in his opinion concurring in the judgment, also noted the same question in terms of the effect of the "public trial" clause of the Sixth Amendment but expressed no views thereon as the parties agreed that the question was not before the Court. 427 U.S. at 576, 96 S.Ct. at *143 2811, 49 L.Ed.2d at 707, n. 3. However, in Branzburg v. Hayes, 408 U.S. 665, 684-685, 92 S.Ct. 2646, 2658, 33 L.Ed.2d 626, 641 (1972), the majority opinion states that:
* * * Newsmen * * * may be prohibited from attending or publishing information about trials if such restrictions are necessary to assure a defendant a fair trial before an impartial tribunal. (emphasis added)
In the appeals before us, the trial courts did not order that the evidentiary hearings be held in camera. The legality and constitutionality of such procedure, therefore, is not directly in issue and has not been addressed by the parties to any substantial extent.
We have in the past referred to the right of a trial court to hold a proceeding in camera. See In re National Broadcasting Company, 64 N.J. 476, 479 (1974). It is not uncommon in a criminal trial for the court and counsel to hold side bar conferences out of the hearing of the jury as to matters which might be prejudicial for the jury to hear. These conferences are recorded and become part of the trial record. Nonetheless, as a practical matter, neither the press nor the public are privy to what transpires.
In State v. Jackson, 43 N.J. 148 (1964), a murder case, the trial court had denied without hearing the defendants' motion for bail made shortly before trial, on the ground that publicity which might result from the bail hearing would pose a danger to the defendants' right to a fair trial. The trial court rejected the notion that the bail hearing could be held in camera. This Court indicated otherwise, and, after observing that the trial court entertained too limited a view of its powers, suggested that the motion could have been heard in camera if defendants so requested. 43 N.J. at 163-164.
Such a procedure, as applied to an evidentiary hearing, would insure that a non-sequestered jury would not be exposed to prejudicial information and at the same time *144 would avoid any direct restraint on the news media. Cf. Smith v. State, 317 A.2d 20, 24 (Sup. Ct. Del. 1974).[3]
Against this course must be balanced the concept that court proceedings should be subject to public scrutiny and that the public has a right to expect that criminal trials will be conducted in open court. Wiggins, The Public's Right to Public Trial, 19 F.R.D. 25 (1955). It has been suggested that this may be a constitutional requirement.
From the standpoint of the press, the in camera procedure, while not a direct restraint, arguably achieves the same result by more subtle means and becomes in effect a prior restraint on the news-gathering ability of the press. See Branzburg v. Hayes, supra, 408 U.S. at 707, 92 S.Ct. at 2669, 33 L.Ed.2d at 655.
None of these issues has been adequately briefed or argued, not being necessary to resolution of the present matter. Consequently we feel it would be inappropriate to try to resolve them in the framework of the present appeals.
It should be emphasized that in a criminal case a trial court will seldom be confronted with a situation where consideration must be given to use of the in camera procedure. An evidentiary hearing in the day-to-day criminal trial rarely generates sufficient news interest to warrant press coverage. Often the press is not even present. Many criminal trials are concluded within a period of time that would make academic any question of possible prejudice through news accounts. Frequently the question of the voluntariness of a statement given by a defendant or the admissibility of evidence can be heard and decided without the necessity of disclosing the text of the statement or the nature of the evidence. Nor should the willingness of the news media to exercise self restraint be overlooked. "A responsible press has always been regarded as the handmaiden *145 of effective judicial administration, especially in the criminal field." Sheppard v. Maxwell, 384 U.S. 333, 350, 86 S.Ct. 1507, 16 L.Ed.2d 600, 613 (1966).
If a criminal trial is newsworthy and attracts widespread press coverage, the trial court should seriously weigh the need for sequestration of the jury. At the least, the jury should be forcefully instructed not to read or listen to news accounts of the trial proceedings and emphatically reminded of its sworn duty to decide the issues only on evidence presented in open court.
Assuming that an in camera evidentiary hearing is not contrary to First Amendment principles or any other relevant constitutional concept, it should be used with circumspection. The trial court should first resort to other alternatives unless it concludes that they are not feasible or proper under the circumstances. Only then, and upon a clear showing of a serious and imminent threat to the integrity of the trial, and with the express consent of the defendant, should consideration be given to holding the evidentiary hearing in camera.
These appeals do not involve any question of possible prejudice to a defendant's right to a fair trial resulting from pre-trial publicity. In such circumstances, the trial court has available additional means such as (a) adjournment of the trial to allow public attention to subside, (b) change of venue, (c) foreign jury, (d) searching questioning of prospective jurors to screen out those infected by pretrial publicity and, (e) emphatic and clear instructions to the jury to decide the issues only on evidence presented in open court. See Sheppard v. Maxwell, supra, 384 U.S. at 357-362, 86 S.Ct. at 1519-1522, 16 L.Ed.2d at 617-620; Nebraska, supra, 427 U.S. at 563, 96 S.Ct. at 2805, 49 L.Ed.2d at 700.
Moreover, the trial court has the power to exercise sufficient control over the prosecutor, counsel for defense, the accused, witnesses and court staff to prevent the release or disclosure of improper information by these sources. Sheppard v. Maxwell, supra. See, American Bar Ass'n., Standards *146 for Criminal Justice, Fair Trial and Free Press, supra, § 2.1.
The orders under review restraining the reporting of proceedings in open court are illegal and void for the reasons heretofore stated and are hereby vacated.
PASHMAN, J., concurring.
The issues which these cases raise are of fundamental importance. They provide a matrix for considering the interplay between two of our most basic constitutional guarantees  free speech and fair trial  which are also, as Mr. Justice Black correctly noted, "two of the most cherished policies of our civilization." Bridges v. California, 314 U.S. 252, 260, 62 S.Ct. 190, 192, 86 L.Ed. 192, 201 (1941).

I
As the majority concludes, these appeals should not be dismissed as moot. Whether or not they are technically moot,[1] the issues are appropriate for resolution for two reasons. First, they fall within the category of cases which are "capable of repetition, yet evading review." See, e.g., Nebraska Press Association v. Stuart, 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976); Weinstein v. Bradford, 423 U.S. 147, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975); Roe v. Wade, 410 U.S. 113, 125, 93 S.Ct. 705, 713, 35 L.Ed.2d 147, 161 (1973). Since these orders are intended and are necessary only for the duration of the trial, they would normally expire by their own terms before this Court could consider such a case. Yet, the parties in these appeals  *147 the State, the Public Defender, and various press associations  will inevitably be faced with recurrences of this problem unless the Court acts.
Second, the overriding importance of these questions out-weighs any interest that we might have in disposing of the instant cases on grounds of mootness. See, e.g., Housing Authority of Newark v. West, 69 N.J. 293, 295-296 (1976); Dunellen Bd. of Ed. v. Dunellen Ed. Ass'n, 64 N.J. 17, 21 (1973); Busik v. Levine, 63 N.J. 351, 364 (1973), app. dismissed 414 U.S. 1106, 94 S.Ct. 831, 38 L.Ed.2d 733 (1973); John F. Kennedy Memorial Hospital v. Heston, 58 N.J. 576, 579 (1971); Bd. of Ed. E. Brunswick Tp. v. Coun. E. Brunswick, 48 N.J. 94, 109 (1966); State v Perricone, 37 N.J. 463, 469 (1962), cert. den. 371 U.S. 890, 83 S.Ct. 189, 9 L.Ed.2d 124 (1962); Sente v. Mayor and Mun. Coun. Clifton, 66 N.J. 204, 209 (1974) (Pashman, J., dissenting). The vigorous debate by the parties has focused the Court's attention on both the pertinent factual and legal issues and has developed the ramifications of these questions.
This second rationale applies not only to the protective orders imposed by the trial courts; it also militates in favor of discussing various alternatives to such orders. This is not a case where the issue sought to be decided has not been briefed by the parties and does not appear in the record. See Bd. of Ed. of Elizabeth v. City Coun. of Elizabeth, 55 N.J. 501, 509 (1970); Oliver v. Russo, 29 N.J. 418, 420 (1959). Although none of these alternatives was actually used by the trial judges involved in these cases, in both instances the various proposals discussed by the majority were considered. Judge Diana, in State v. Allen, indicated that he was aware of the possibility of changing venue, utilizing a foreign or a sequestered jury, cautionary instructions, or a combination of such procedures. In State v. Hughes and Thompson, Judge Moore considered the possibility of using in camera proceedings as a device to keep potentially inadmissible evidence from the jurors. These alternative procedures *148 have also received ample attention in the briefs submitted to the Court.
Admittedly, the record is devoid of any indication of how these procedures actually work, and thus our discussion is necessarily speculative in certain respects. Nevertheless, we are guided by the wealth of available literature and other cases which treat the potential impact of such procedures. For a general discussion of such alternatives, see, e.g., Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); Nebraska Press Association v. Stuart, supra, (Brennan, Stewart, Marshall, JJ., concurring); United States v. Schiavo, 504 F.2d 1 (3 Cir.) (en banc) (Aldisert, J., dissenting), cert. den. 419 U.S. 1096, 95 S.Ct. 690, 42 L.Ed.2d 688 (1974); American Bar Ass'n, Minimum Standards For Criminal Justice, Fair Trial and Free Press (Approved Draft 1968); Association of the Bar of the City of New York Special Comm. on Radio, Television, and the Administration of Justice, Freedom of the Press and Fair Trial (1967); Committee on the Operation of the Jury System, "Report on the `Free Press-Fair Trial' Issue," 45 F.R.D. 391 (1968); Broeder, Voir Dire Examinations: An Empirical Study," 38 S. Cal. L. Rev. 503 (1965); Babcock, "Voir Dire: Preserving `Its Wonderful Power,'" 27 Stan. L. Rev. 545 (1975); Comment, "Gagging the Press in Criminal Trials," 10 Harv. Civ. Rights-Civ. Lib. L. Rev. 608 (1975); Comment, "Sequestration: A Possible Solution to the Free Press-Fair Trial Dilemma, 23 Am. U.L. Rev. 923 (1974); Stagna, "Judicial Protection of the Criminal Defendant Against Adverse Press Coverage," 13 Wm. & Mary L. Rev. 1 (1971). Furthermore, this Court has considered such procedures before. See In re National Broadcasting Company, 64 N.J. 476 (1974) (courtroom sketches); State v. Jackson, 43 N.J. 148, 163-164 (1964), cert. den. 379 U.S. 982, 85 S.Ct. 690, 13 L.Ed.2d 572 (1965) (exclusion of press and public); State v. Van Duyne, 43 N.J. 369 (1964), cert. den. 380 U.S. 987, 85 S.Ct. 1359, 14 L.Ed.2d 279 (1965) (whether publicity prejudiced jury); State *149 v. Gallicchio, 51 N.J. 313 (1968), cert. den. 393 U.S. 912, 89 S.Ct. 233, 21 L.Ed.2d 198 (1968) (effect of lapse of time between publicity and trial); State v Kavanaugh et al., 52 N.J. 7 (1968), cert. den. 393 U.S. 924, 89 S.Ct. 254, 21 L.Ed.2d 259 (1968) (restricting attorney from circulating material to the media); State v. Curcio, 23 N.J. 521 (1957) (curative instructions).
Since it is unlikely that any single trial will present a factual situation involving more than one of the alternative measures outlined by the majority, abstention in this case would require us to consider the various options in a piecemeal fashion. As Chief Justice Weintraub noted in Busik v. Levine, supra, a court may treat an issue expansively if such treatment is warranted by the public interest:
[T]here is no constitutional mandate that a court may not go beyond what is necessary to decide a case at hand. Whether an issue will be dealt with narrowly or expansively calls for a judge's evaluation of many things, including the need for guidance for the bar or agencies of government or the general public. To that end, the Court may express doubts upon existing doctrines, thereby inviting litigation, or may itself raise an issue it thinks should be resolved in the public interest, or may deliberately decide issues which need not be decided when it believes that course is warranted.
[63 N.J. at 363-364; citations omitted.]
Finally, by suggesting procedures for keeping inviolate First and Sixth Amendment guarantees, we avoid future infringements upon those rights.[2] Not only can we avoid the waste of judicial resources which would result from a decision to consider each alternative on a case-by-case basis, *150 but we can avoid the harm to both defendants and the public which those appeals would inevitably be attempting to remedy.

II

A.
There can be little doubt that the trial courts' orders in these cases are unconstitutional under Nebraska Press Assoc. v. Stuart, supra, and Oklahoma Publishing Co. v. District Court In and For Oklahoma County, 430 U.S. 308, 97 S.Ct. 1045, 51 L.Ed.2d 355 (1977). In the Nebraska case the Court held that a judge could not prevent the press from reporting or commenting upon any information derived from public court proceedings or records stemming from the brutal murder of six persons in Sutherland, Nebraska, a town of about 800 people. Chief Justice Burger, writing for the majority, found that the case did not present an irreconcilable conflict between the First and Sixth Amendments, and that the State had failed to meet the "heavy burden imposed as a condition to securing a prior restraint." 427 U.S. at 570, 96 S.Ct. at 2808, 49 L.Ed.2d at 704. In the Oklahoma case, the Court applied the Nebraska holding to an attempt by Oklahoma authorities to prevent reporters from publishing the name and pictures of a juvenile. Although his name and picture were obtained during a public pretrial proceeding and his subsequent departure from the courthouse, the trial court refused to allow their disclosure in the news. Relying upon Nebraska, the Supreme Court held that the information in question had been "publicly revealed in connection with the prosecution of the crime" and that therefore the District Court's order abridged the freedom of the press. 430 U.S. at 310, 97 S.Ct. at 1046.
Justice Brennan concurred in Nebraska Press Assoc. v. Stuart, supra, in an opinion in which Justices Marshall and Stewart joined. He wrote: *151 The right to a fair trial by a jury of one's peers is unquestionably one of the most precious and sacred safeguards enshrined in the Bill of Rights. I would hold, however, that resort to prior restraints on the freedom of the press is a constitutionally impermissible method for enforcing that right; judges have at their disposal a broad spectrum of devices for ensuring that fundamental fairness is accorded the accused without necessitating so drastic an incursion on the equally fundamental and salutary constitutional mandate that discussion of public affairs in a free society cannot depend on the preliminary grace of judicial censors.
[427 U.S. at 572, 96 S.Ct. at 2809, 49 L.Ed.2d at 705]
I agree with this statement in all respects, and believe that it amply supports his conclusion that "[d]amage to ... Sixth Amendment right[s] could never be considered so direct, immediate and irreparable, and based on such proof rather than speculation," that it would sustain a prior restraint on the press. 427 U.S. at 604, 96 S.Ct. at 2824, 49 L.Ed.2d at 724.
Any inquiry into this area must begin with the long list of cases which have invalidated prior restraints. Foremost among them is Near v. Minnesota, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931) where Chief Justice Hughes stated:
In determining the extent of the ... [First Amendment], it has been generally, if not universally, considered that it is the chief purpose of the guaranty to prevent previous restraints upon publication.
[283 U.S. at 713, 51 S.Ct. at 630, 75 L.Ed. at 1366]
See also Southeastern Promotions, Ltd. v. Conrad, 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975); Grosjean v. American Press Co., 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660 (1936); Patterson v. Colorado, 205 U.S. 454, 27 S.Ct. 556, 51 L.Ed. 879 (1907). Underlying prior restraints is the notion of censorship. Southeastern Promotions, Ltd. v. Conrad, supra; Shuttlesworth v. Birmingham, 394 U.S. 147, 151, 89 S.Ct. 935, 939, 22 L.Ed.2d 162, 167 (1969); Staub v. Baxley, 355 U.S. 313, 322, 78 S.Ct. 277, 282, 2 L.Ed.2d 302, 311 (1958); Lovell v. Griffin, 303 U.S. 444, 452, 58 S.Ct. 666, 669, 82 L.Ed. 949 at 954 (1938).
*152 In keeping with the disdain for prior restraints, the Supreme Court has consistently held that "`[a]ny system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity.'" Pell v. Procunier, 417 U.S. 817, 832, 94 S.Ct. 2809, 41 L.Ed.2d 495, 507 (1974); New York Times Co. v. United States, 403 U.S. 713, 714, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971); Organization for a Better Austin v. Keefe, 402 U.S. 415, 91 S.Ct. 1575, 29 L.Ed.2d 1 (1971); Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 70, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963); Near v. Minnesota, supra. Yet, while the Court has indicated that the prohibition against prior restraints is not absolute, Near v. Minnesota, supra, 283 U.S. at 716, 51 S.Ct. 625, it very nearly approaches that point. The "military security" exception outlined in Near v. Minnesota, supra, presents the only occasion in which the government might meet its burden of proof in justifying a prior restraint.[3] The Court in Near explained:
`When a nation is at war many things that might be said in time of peace are such a hindrance to its effort that their utterance will not be endured so long as men fight and that no Court could regard them as protected by any constitutional right.' Schenck v. United States, 249 U.S. 47, 52, 39 S.Ct. 247, 249, 63 L.Ed. 470. No one *153 would question but that a government might prevent actual obstruction to its recruiting service or the publication of the sailing dates of transports or the number and location of troops.
[283 U.S. at 716, 51 S.Ct. at 631, 75 L.Ed. at 1367]
Yet even this exception is narrowly confined. In New York Times Co. v. United States, supra, the Court considered a prior restraint against publishing the famous "Pentagon Papers." Despite warnings by Justice Blackmun that publication of documents relating to this country's role in Viet Nam might impede efforts to negotiate an end to the war, with the result that additional soldiers might be killed, alliances ruined, and United States prisoners prevented from returning home, the Court held the prior restraint to be unconstitutional. Two of the Justices in that case, Black and Douglas, took an absolute position, finding that the First Amendment "leaves ... no room for governmental restraint on the press." 403 U.S. at 720, 91 S.Ct. at 2144, 29 L.Ed.2d at 828 (Douglas, Black, JJ., concurring); footnote omitted. Justices Stewart and White argued that the government had failed to show that publication would result in "direct, immediate, and irreparable damage" to the country, 403 U.S. at 730, 91 S.Ct. at 2149, 29 L.Ed.2d at 834 (Stewart, White, JJ., concurring), even though they found that publication of the documents might "do substantial damage to public interests." 403 U.S. at 731, 91 S.Ct. at 2150, 29 L.Ed.2d at 834-835 (White, Stewart, JJ., concurring). Finally, Justice Brennan emphasized the speculative nature of the Government's proofs and concluded that it had failed to demonstrate that the prior restraint in that case fell within the "Near exception:"
Thus, only governmental allegation and proof that publication must inevitably, directly, and immediately cause the occurrence of an event kindred to imperiling the safety of a transport already at sea can support even the issuance of an interim restraining order.
[403 U.S. at 726-727, 91 S.Ct. at 2148, 29 L.Ed.2d at 832.]
Thus, the six Justices joining in the per curiam opinion in the New York Times case expressly held that the Government *154 must show some type of impending direct and immediate harm, of a grave nature, before a prior restraint will issue. And two of those six indicated that not even this would suffice. In the present case the State has demonstrated no such interest; it has not even shown that restrictions on publication were necessary in the context of the two criminal trials with which we are concerned.

B.
As Justice Brennan noted in the New York Times case, the problem with prior restraints is that they require speculation as to the harm which will result from publication. See 403 U.S. at 725-727, 91 S.Ct. at 2147-2148, 29 L.Ed.2d at 831-832 (Brennan, J., concurring). Yet prejudice in criminal trials cannot be presumed merely by virtue of the fact that reports of events related to the proceedings will be published. This Court considered that problem in State v. Van Duyne, supra. The defendant in that case was accused and convicted of murdering his wife. Among other challenges to his conviction, defendant asserted that prejudicial stories appearing in local papers while the jury was being drawn deprived him of a fair trial.[4] The trial judge in that case had allowed liberal questioning of the jurors to determine if they had seen the articles. Although various prospective jurors had stated that they were aware of the reports, only those who had indicated that they had formed an opinion and could not decide the case on the basis of the evidence were excused. This Court refused to overturn the conviction, noting *155 that it had failed to find "sufficient evidence that the newspaper articles of themselves prevented a fair trial or that they so infected the minds of some of the jurors as to leave them biased against the defendant." 43 N.J. at 386.
The burden which must be met in showing jury prejudice from publication supports the notion that First and Sixth Amendment guarantees need not be interpreted as representing irreconcilable interests. That standard must be drawn to reflect the fact that we live in an informed society, and that immediate and comprehensive coverage of newsworthy events is a commonplace occurrence. In Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961) the Court found:
In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case.
[366 U.S. at 722, 81 S.Ct. at 1642, 6 L.Ed.2d at 756]
Similarly, in Reynolds v. United States, 98 U.S. 145, 25 L.Ed. 244, as long ago as 1878 the Court stated:
In these days of newspaper enterprise and universal education, every case of public interest is almost, as a matter of necessity, brought to the attention of all the intelligent people in the vicinity, and scarcely any one can be found among those best fitted for jurors who has not read or heard of it, and who has not some impression or some opinion in respect of its merits.
[98 U.S. at 155-156, 25 L.Ed. at 246]
On the other hand, the defendant's interest in being judged by a jury capable of deciding the case solely on the basis of the evidence adduced in court cannot be abridged. See, e.g., Sheppard v. Maxwell, supra, 384 U.S. at 351, 86 S.Ct. at 1516, 16 L.Ed.2d at 613; Marshall v. United States, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959); Irvin v. Dowd, supra, 366 U.S. at 723-724, 81 S.Ct. at 1642-1643, 6 L.Ed.2d at 756-757. While in *156 earlier cases the United States Supreme Court had suggested the necessity of showing actual prejudice resulting from newspaper publicity, Adams v. United States ex rel. McCann, 317 U.S. 269, 281, 63 S.Ct. 236, 242, 87 L.Ed. 268, 276 (1942) (referring to "the burden of showing essential unfairness ... as a demonstrable reality."); Darcy v. Handy, 351 U.S. 454, 76 S.Ct. 965, 100 L.Ed. 1331 (1956); Stroble v. California, 343 U.S. 181, 72 S.Ct. 599, 96 L.Ed. 872 (1952), later cases have indicated that a probability of unfairness is sufficient. Sheppard v. Maxwell, supra; Estes v. Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); Turner v. Louisiana, 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965); Rideau v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963). As we noted in State v. Van Duyne, supra, to result in a prejudicial verdict, publicity must prevent the jurors from reaching a fair determination of the defendant's guilt or innocence based upon the evidence which has been shown to them at trial. While a finding of prejudice need not be limited to cases involving this circumstance, a court may take into account the fact that the published information was not admitted into evidence at trial. State v. Van Duyne, supra, 43 N.J. at 384; State v. Trantino, 45 N.J. 37, 40 (1965), cert. den. 382 U.S. 993, 86 S.Ct. 573, 15 L.Ed.2d 479 (1966), reh. den. 383 U.S. 922, 86 S.Ct. 901, 15 L.Ed.2d 679 (1966).
In the instant cases, there has been no showing that such prejudice would have resulted if the prior restraints had not been issued. In both cases the judges issued the "gag" orders before deciding whether the evidence was admissible. In the Hughes and Thompson case, the trial judge issued the order prior to conducting a hearing on the testimonial capacity of a witness. In the Allen case, the trial judge issued the order before holding an evidentiary hearing on the defendant's confession and an inculpatory statement by a co-defendant. The judge indicated that he was not concerned with the problem of pre-trial publicity generally, *157 but issued the protective "gag" solely because of the possibility of prejudice stemming from the statements. In both cases, the judges acted without knowing the extent to which the restricted information would be covered in the press, and without any means of assessing what impact, if any, it might have had on any of the jurors if they happened to see the reports.[5] In both cases the judges avoided the problem of determining whether newspaper accounts would have prevented the jury from reaching an untainted verdict; instead they engaged in the speculative type of reasoning which underlies our distrust of prior restraints on the press. See ante at 153 of 72 N.J. (Pashman, J., concurring).

C.
While there has been much debate over the argument that the press should receive greater access than the general public to sources and newsworthy events, see, e.g., Pell v. Procunier, supra; Saxbe v. Washington Post Co., 417 U.S. 843, 94 S.Ct. 2811, 41 L.Ed.2d 514 (1974) (companion case); Branzburg v. Hayes, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972); Comment, "The Right of the Press to Gather Information After Branzburg and Pell," 124 U. Pa. L. Rev. 166 (1975); Note, "The Rights of the Public and *158 the Press to Gather Information," 87 Harv. L. Rev. 1505 (1974); Note, "Public and Press Rights of Access to Prisoners after Branzburg and Mandel," 82 Yale L.J. 1337 (1973); Note, "The Right of the Press to Gather Information," 71 Colum. L. Rev. 838 (1971); Wiggins, "The Public's Right to Public Trial," 19 F.R.D. 25 (1955), that question is simply not implicated in this case. The public nature of a trial is sufficient to sustain the press's claim to report court proceedings.
While it is not necessary to extend the principle to every proceeding or every type of case,[6] it can be safely asserted that a trial is a public proceeding. The public interest in learning what transpires during court proceedings has been reaffirmed on numerous occasions. The Court in Craig v. Harney, 331 U.S. 367, 67 S.Ct. 1249, 91 L.Ed. 1546 (1947) stated the matter simply: "What transpires in the court room is public property." Id. at 374, 67 S.Ct. at 1254, 91 L.Ed. at 1551. The relationship between freedom of the press and the public interest in open trials was eloquently stated by Justice Clark in Sheppard v. Maxwell:
The principle that justice cannot survive behind walls of silence has long been reflected in the "Anglo-American distrust for secret *159 trials." ... A responsible press has always been regarded as the handmaiden of effective judicial administration, especially in the criminal field. Its function in this regard is documented by an impressive record of service over several centuries. The press does not simply publish information about trials but guards against the miscarriage of justice by subjecting the police, prosecutors, and judicial processes to extensive public scrutiny and criticism.
[384 U.S. at 349-350, 86 S.Ct. at 1515, 16 L.Ed.2d at 613; citation omitted]
See Wigmore, Evidence (Chadbourn rev. 1976), § 1834, discussing the underlying reasons for making trials public.
The majority in the Nebraska and Oklahoma cases emphasized the fact that "once a public hearing had been held, what transpired there could not be subject to prior restraint." 427 U.S. at 568, 96 S.Ct. at 2807, 49 L.Ed.2d at 703. However, Justice Brennan's analysis in Nebraska goes beyond the majority in a significant respect by emphasizing the importance of press coverage of events leading up to and surrounding the trial process. Such coverage may perform numerous beneficial functions such as exposing improper methods of law enforcement officials and judges, thereby leading to movements for reform; informing the public of action which is being taken in individual cases, thus furthering the democratic processes where political corruption is charged and allaying fears where it is thought that the suspect may still be at large; generating crucial debate on the criminal justice system as a whole by pointing out that certain persons had not been prosecuted or had received only mild sentences; and making the public aware of the prevalence of certain types of crimes, particularly where they are of a political nature or indicate the possibility of wide-spread government corruption. See 427 U.S. at 606, 96 S.Ct. at 2825, 49 L.Ed.2d at 725. To these might be added benefits which are felt in the trial itself. As Wigmore noted, public scrutiny improves the quality of testimony by discouraging perjury; it influences the judge, jury and counsel to act more conscientiously; and finally, it increases the respect for the *160 law through an "intelligent acquaintance" with the administration of justice. Wigmore, supra, § 1834 at 435-438.[7]

III

A.
There is no reason to believe that both trial judges did not have adequate alternative means of protecting the defendants' Sixth Amendment rights to an impartial jury. Even if they were correct in assuming that the jurors would have been prejudiced if the information had been publicized, see ante at 156-157 of 72 N.J. (Pashman, J., concurring), they could have utilized any one of the numerous devices for ensuring the impartiality of the jury without resorting to methods which have such an injurious effect on First Amendment rights.
Although the restrictive "gags" were imposed after the juries were empanelled, this is an insufficient basis for distinguishing the result in these appeals from those in the Nebraska and Oklahoma cases. Both defendants could have been accorded their full Sixth Amendment right to a fair trial without "gagging" the press. If the trial judges were unsure whether the information would have even reached the jurors, they could have utilized a voir dire of jurors. If jurors had read news accounts, either judge could have issued strongly worded cautionary instructions to the jury. Since the information was revealed in hearings occurring in each case prior to the beginning of deliberation, the judges also had the option of dismissing a prejudiced juror and proceeding with one of the alternates. If, on the other hand, either judge was fairly certain that the information was *161 likely to reach the jurors and would have been prejudicial, he could have considered other alternatives. If none of the above techniques would have been successful, either alone or in combination, and the parties could not have been convinced to stipulate to the facts, the juries could have been sequestered. In the unfortunate and unlikely event that even sequestration failed to prevent jurors from receiving prejudicial information, the trial judges still would not have been required to choose between First and Sixth Amendment guarantees; the availability of a mistrial should have assured both trial judges that a choice between constitutional provisions need never have been made. See State v. Van Duyne, supra, 43 N.J. at 387.

B.
The decision which procedures to use in avoiding jury prejudice will depend upon the nature of the particular problem facing the trial court. Where the issue arises before a jury is drawn, there is greater flexibility. The trial judge may order a change of venue, require a foreign jury or a continuance, or voir dire prospective jurors.
Of these alternatives the voir dire involves the least imposition on the State, the defense and jurors. It is a normal part of the trial process, and can be helpful not only in removing prejudiced persons from the jury,[8] but also in assessing the need for a change of venue, a continuance, or a foreign jury. State v. Trantino, supra, 45 N.J. at 40. The trial judge should carefully question each juror as to his knowledge of news reports and what effect they have had *162 on his ability to judge the case fairly. The proceeding should be conducted in such a way that jurors who are aware of such reports do not contaminate the remaining pool of persons. See State v. Rios, 17 N.J. 572, 586-588 (1955). Questions should not be phrased in a manner which will increase the likelihood that publicity will have an adverse impact on a juror's conception of the case.
While it is generally held that the existence of pretrial publicity alone will not justify a transfer or continuance, see Bearden v. United States, 320 F.2d 99 (5 Cir.1963), cert. granted and judgment vacated and remanded, 372 U.S. 252, 83 S.Ct. 875, 9 L.Ed.2d 732 (1963), cert. den. 376 U.S. 922, 84 S.Ct. 679, 11 L.Ed.2d 616 (1964); United States v. Decker, 304 F.2d 702 (6 Cir.1962), aff'd 378 F.2d 245 (6 Cir.1967), where it is obvious that a jury free of preconceived notions of the evidence cannot be drawn, the court should consider the other remedies without resorting to a voir dire. In utilizing a transfer or continuance,[9] the trial judge should consider the potential harm from such delay or inconvenience. Obviously, other factors will influence the trial court as well, such as whether publicity is likely to recur when the trial begins, and whether pretrial publicity will be equally pervasive in the place to which the trial is moved. A delay poses the additional problem in that it creates a potential for abridging the defendant's right to a speedy trial. Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972); Groppi v. Wisconsin, 400 U.S. 505, 510, 91 S.Ct. 490, 27 L.Ed.2d 571, 575-576 (1971).
Procedures should be used throughout the trial process to control the release of information by law enforcement officials and court personnel. See Sheppard v. Maxwell, *163 supra, 384 U.S. at 359, 86 S.Ct. at 1520, 16 L.Ed.2d at 618; Nebraska Press Assoc. v. Stuart, supra, 427 U.S. at 601, 96 S.Ct. at 2823, 49 L.Ed.2d at 722, n. 27 (Brennan, J., concurring). This would seem sound not only from the perspective of protecting the defendant's right to have publicity limited, but also from the State's interest in minimizing erroneous reports and rumors which inevitably occur when no restrictions are placed on such statements. In State v. Van Duyne, supra, this Court interpreted the Canons of Professional Ethics to ban statements to news media by prosecutorial staff or defense counsel. See also Sheppard v. Maxwell, supra, 384 U.S. at 361, 86 S.Ct. at 1522, 16 L.Ed.2d at 619-620. In State v. Kavanaugh, et al., supra, this Court revoked an attorney's authority to appear pro hac vice where he had been improperly circulating material to the press. Restrictions on an attorney's right to discuss his case publicly may be imposed when he is undermining the fairness of the trial process.[10]See DR 7-107.
After the jury is empanelled, the trial judge's options are more limited. Nevertheless, by various devices, defendants' rights can still be protected. Jurors should be questioned if reports are published during the trial; cautionary instructions or sequestration may be appropriate; if alternates *164 are available, prejudiced jurors may be dismissed; and finally, if prejudice results, a mistrial should be ordered.
Cautionary instructions are often used in trials, and can be helpful, both as a way of informing jurors as to their proper role in the trial process and ordering that they disregard certain evidence. Obviously, realistic expectations should be made of the jury, and in many instances this alternative will not suffice by itself. Cf., United States v. Schiavo, supra, 504 F.2d at 24 (Aldisert, J., dissenting), Comment, "Sequestration: A Possible Solution to the Free Press-Fair Trial Dilemma," supra, 23 Am. U.L. Rev. at 932-933. As in the voir dire, instructions should be worded in a way which will avoid raising the jurors' curiosity and therefore act as an encouragement to disobedience. However, they may be used successfully where news coverage is not widespread, the information contained in the reports does not conflict with testimony proven in court, and it is factual rather than emotional in nature. Where instructions are used realistically, courts have refused to presume that jurors will disobey them. State v. Curcio, supra, 23 N.J. at 527-528; State v. Rios, supra, 17 N.J. at 589; State v. Cottone, 52 N.J. Super. 316, 326-27 (App. Div. 1958), certif. den. 28 N.J. 527 (1959); State ex rel. Superior Ct. v. Sperry, 79 Wash.2d 69, 483 P.2d 608 (1971), cert. den. 404 U.S. 939, 92 S.Ct. 272, 30 L.Ed.2d 252 (1971).
Where publicity is widespread and cautionary instructions are not likely to remove the threat of prejudice, the jury may be sequestered. This technique was specifically mentioned by the majority in Nebraska:
Sequestration of jurors is, of course, always available. Although that measure insulates jurors only after they are sworn, it also enhances the likelihood of dissipating the impact of pretrial publicity and emphasizes the elements of the jurors' oaths.
[427 U.S. at 564, 96 S.Ct. at 2805, 49 L.Ed.2d at 700]
See also id. at 601, 96 S.Ct. at 2822, 49 L.Ed.2d at 722 (Brennan, J., concurring); Sheppard v. Maxwell, supra, *165 384 U.S. at 359, 86 S.Ct. at 1520, 16 L.Ed.2d at 618; Comment, "Sequestration: A Possible Solution to the Free Press-Fair Trial Dilemma," supra. If publicity is pervasive or of an emotional quality, sequestration may be appropriate even before the entire jury is empanelled. State v. Van Duyne, supra, 43 N.J. at 388. However, usually this should not be necessary. State v. Rios, supra, 17 N.J. at 587. In the instant case, "gag" orders were not imposed because of a fear that there would be widespread publicity which might infect the trial process, but because of information which surfaced after the jury was chosen. Consequently, it is not disputed that this alternative would have successfully protected defendants' Sixth Amendment rights.
Yet sequestration should not be considered as a panacea for the problem of prejudicial publicity. Because it is costly to the State, inconveniences jurors and may have an adverse impact on the deliberative process,[11] it should be utilized only if other less burdensome alternatives would be ineffective. As the majority correctly points out, R. 1:8-6 (a) provides for sequestration prior to instructing the jury only where it is found that "there are extraordinary circumstances." Nevertheless, in a highly publicized trial it may be the only way of protecting First and Sixth Amendment rights without resorting to either a mistrial or methods which impinge upon First Amendment interests.
*166 Other than a reversal or mistrial, the only remaining alternative would be to utilize in camera hearings. See ante at 142 of 72 N.J. Although it is not necessary to rule out this alternative completely, it should be noted that there are serious problems with this approach. As the majority states
[f]rom the standpoint of the press, the in camera procedure, while not a direct restraint, arguably achieves the same result by more subtle means and becomes in effect a prior restraint on its news-gathering ability.
[At 144 of 72 N.J.]
The fact that the United States Supreme Court has chosen to emphasize that press "gags" were imposed on reporting events which transpired in open court, Nebraska, supra, 427 U.S. at 570, 96 S.Ct. at 2808, 49 L.Ed.2d at 704; Oklahoma Publishing Co. v. District Court In and For Oklahoma County, supra, 430 U.S. at 311, 97 S.Ct. 1047; cf. Estes v. Texas, supra, 381 U.S. at 541-42, 85 S.Ct. at 1632-33, 14 L.Ed. 2d at 549-50, should not be used as a justification for closing court proceedings to the press and the public. It must be realized that the use of closed proceedings has the capacity to subvert the entire effect of our decision today.
I find it unnecessary to analyze the propriety of in camera hearings solely in terms of whether the press or the public has a First Amendment right to be present during court proceedings.[12] See post at 169 of 73 N.J. (Schreiber, J., *167 concurring). The strong policy reasons for making trials public are related to many of the same concerns which underlie the First Amendment, but they are also grounded in values associated with the criminal justice system itself. See ante at 156-158 of 73 N.J., at 389 of 373 A.2d (Pashman, J., concurring). See Sheppard v. Maxwell, supra, 384 U.S. at 349-50, 86 S.Ct. at 1515, 16 L.Ed.2d at 613 ("The principle ... has long been reflected in the `Anglo-American distrust for secret trials.'"); E.W. Scripps Co. v. Fulton, 100 Ohio App. 157, 125 N.E.2d 896 (1964), appeal dismissed as moot, 164 Ohio St. 261, 130 N.E.2d 701 (Sup. Ct. 1955).
Accordingly, a substantial number of courts have refused to close trial proceedings even where a defendant has asserted that it was necessary to ensure a fair trial.[13] *168 See United States v. American Radiator & Standard San. Corp., 274 F. Supp. 790 (W.D. Pa. 1967); Phoenix Newspapers, Inc. v. Jennings, 107 Ariz. 557, 490 P.2d 563 (1971); Oxnard Publishing Co. v. Superior Court, 68 Cal. Rptr. 83 (Ct. App. 1968); Kirstowsky v. Superior Court, 143 Cal. App.2d 745, 300 P.2d 163 (Ct. App. 1956); Oliver v. Postel, 30 N.Y.2d 171, 331 N.Y.S.2d 407, 282 N.E.2d 306 (1972); People v. Holder, 70 Misc.2d 31, 332 N.Y.S.2d 933 (Sup. Ct. 1972); E.W. Scripps Co. v. Fulton, supra. See also Singer v. United States, 380 U.S. 24, 35, 85 S.Ct. 783, 790, 13 L.Ed.2d 630, 638 (1965) (dicta) ("although a defendant can, under some circumstances, waive his constitutional right to a public trial, he has no absolute right to compel a private trial."). In this state, such a result might be predicated upon the common law nature of the trial process, or upon court rule. R. 1:2-1 specifically provides:
All trials, hearings of motions and other applications, pretrial conferences, arraignments, sentencing conferences (except with members of the probation department) and appeals shall be conducted in open court unless otherwise provided by rule or statute. * * *

Conclusion
Today's decision should serve to remove any notion that trial judges must choose between fundamental constitutional rights. It should not be taken as a triumph of the First Amendment over the Sixth, or as Justice Brennan eloquently stated, a "sacrifice of precious Sixth Amendment rights on the altar of the First Amendment." Nebraska, 427 U.S. at 612, 96 S.Ct. at 2828, 49 L.Ed.2d at 728. It is, in *169 every way, a decision according equal respect to "two of the most cherished policies of our civilization." Indeed, our democratic institutions are too dependent upon both First and Sixth Amendment guarantees to withstand any other conclusion.
But to the extent that our decision rests on the availability of other alternatives to protect a defendant's right to a fair-minded jury, it will require trial judges to perform their delicate task with an open, flexible attitude; they must be aware of the effect that publicity can have on the attitudes of jurors, and of the impact that each remedy can have in dissolving potential influences. Because restrictive "gag" orders have the effect of stifling the open and robust debate which is so vital to democracy, they can never be considered to be among the trial judge's permissible options. Therefore, I concur in the Court's holding that the orders entered by the trial judges in these cases are unconstitutional.
SCHREIBER, J., concurring.
I heartily agree with the majority and concurring opinions that it is appropriate for the Court, in view of the public interest in these controversies, to address the subject and to project guidelines for trial judges, even though the issues in these cases are moot. Busik v. Levine, 63 N.J. 351, 363-364 (1973); John F. Kennedy Memorial Hospital v. Heston, 58 N.J. 576, 578 (1971). The precise issue involved certain orders which prohibited the press from reporting events which occurred during the course of trial in open court. The United States Supreme Court has spoken directly on the point, holding such orders violate the Fourteenth Amendment to the Federal Constitution. Oklahoma Publishing Co. v. District Court In and For Oklahoma County, 430 U.S. 308, 97 S.Ct. 1045, 51 L.Ed.2d 355 (1977); Nebraska Press Association v. Stuart, 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976); Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966).
*170 In discussing alternatives available to the trial court where the evidence, offer of proof, or argument of counsel is not to be heard by the jury because it may affect the defendant's Sixth Amendment right to a trial by an impartial jury, the majority seems to cast some doubt about the constitutionality of in camera proceedings, which it suggests should be used with caution.[1] In my opinion certain aspects of a trial, such as admissibility of a confession, may be held in camera and such hearings are not violative of the First Amendment. The trial judge should in the exercise of his discretion be permitted to utilize the in camera procedure when the defendant so desires and the subject-matter, if ruled inadmissible, may adversely affect the jury's impartiality.
It is important to recognize the nature of the scope and impact of the federal constitutional guarantee of freedom of the press. The First Amendment states that Congress shall make no law "abridging the freedom of speech, or of the press."[2] On the face of it, therefore, it appears that the framers of the Amendment, unless we ascribe to them an intent simply to be redundant, considered freedom of the press to have certain characteristics distinguishable from the general category of freedom of speech. The language employed has significance. Note that freedom of the press is addressed to an institution, unlike the right to free speech which pertains to the individual.[3] No one would contend *171 that freedom of the press is the equivalent of freedom of speech. Further, the press is cognizant of the difference for it has vigorously argued that its members may not be judicially compelled to divulge sources of information because of the constitutional shelter of the freedom of the press, a shelter not available to the citizenry. Branzburg v. Hayes, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972).
Blackstone had stated approximately 25 years before the First Amendment was drafted that freedom of the press meant freedom from censorship before publication. He wrote: "The liberty of the press is indeed essential to the nature of a free state; but this consists in laying no previous restraint upon publications, and not in freedom from censure for criminal matter when published." 4 W. Blackstone, Commentaries 151-152 (4th Cooley ed. J. Andrews 1899). This concept concerned the right to publish information known by the editor without having to receive prior approval from the government licensor. As Blackstone wrote:
Every freeman has an undoubted right to lay what sentiments he pleases before the public; to forbid this, is to destroy the freedom of the press.... To subject the press to the restrictive power of a licenser, as was formerly done ... is to subject all freedom of sentiment to the prejudices of one man, and make him the arbitrary and infallible judge of all controverted points in learning, religion and government. [Id.]
Freedom from prior restraint in publishing never involved a right to gather news from confidential government activities.
Most of the state constitutions which had been drawn prior to the drafting of the Federal Constitution contained clauses protecting the freedom of the press, but they did not refer to freedom of speech. See, e.g., Part I, Art. XVI of the Massachusetts Constitution of 1780.
Professor Leonard W. Levy, author of Legacy of Suppression: Freedom of Speech and Press in Early American History (1964), which contains the most comprehensive survey *172 of the source materials available on the framers' intent and interpretation of the phrase, points out that "freedom of the press" used in the state constitutions was meant to convey the Blackstonian definition. Id. at 185.
Only three members of the Constitutional Convention attempted to define the parameters of freedom of the press. James Wilson of Pennsylvania at the Pennsylvania Ratifying Convention of 1787 argued that the federal government had not been granted the power to destroy the freedom of the press. He restated the Blackstonian definition that "what is meant by the liberty of the press is that there should be no antecedent restraint upon it." Pennsylvania and the Federal Constitution 1787-1788, at 308-309 (J. McMaster & F. Stone eds. 1888). Hugh Williamson, a Constitutional Convention delegate from North Carolina, was of the same view. Williamson, "Remarks on the New Plan of Government," in Essays on the Constitution of the United States, 394, 398 (P. Ford ed. 1892). The third was George Nicholas of Virgina, who also accepted Blackstone's definition. L. Levy, supra at 217.[4] The debates in the First Congress which framed the First Amendment do not suggest any different interpretation. 1 Annals of Congress (1789).
In view of the historical background in which the freedom of the press concept was nurtured, it is not surprising that Mr. Justice Stewart has concluded that the primary purpose of the constitutional guarantee of a free press was "to create a fourth institution outside the Government as an additional check on the" executive, legislative and judicial branches. "Or of the Press," Address of Mr. Justice Stewart, Yale Law School Sesquicentennial Convocation (November 2, 1974).[5]
*173 This salutary purpose is based on the right to criticize. It is not predicated on a right to know. The Constitution is not a Sunshine Law[6] and the United States Supreme Court has made it clear that there is no constitutional guarantee that the press has any greater right to obtain information than the public.
In Branzburg v. Hayes, 408 U.S. 665, 684, 92 S.Ct. 2646, 2658, 33 L.Ed.2d 626, 641 (1972), Mr. Justice White commented:
It has generally been held that the First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally.
In Pell v. Procunier, 417 U.S. 817, 834, 94 S.Ct. 2800, 2810, 41 L.Ed.2d 495, 508-509 (1974), Mr. Justice Stewart writing for the majority held:
The Constitution does not, however, require government to accord the press special access to information not shared by members of the public generally. It is one thing to say that a journalist is free to seek out sources of information not available to members of the general public, that he is entitled to some constitutional protection of the confidentiality of such sources ... and that government cannot *174 restrain the publication of news emanating from such sources.... It is quite another thing to suggest that the Constitution imposes upon government the affirmative duty to make available to journalists sources of information not available to members of the public generally. That proposition finds no support in the words of the Constitution or in any decision of this Court. [footnote omitted]
To the same effect see Saxbe v. Washington Post Co., 417 U.S. 843, 94 S.Ct. 2811, 41 L.Ed.2d 514 (1974); Note, The Rights of the Public and the Press To Gather Information, 87 Harv. L. Rev. 1505, 1521 (1974) (press has no inherent right to special access to information). See also Estes v. Texas, 381 U.S. 532, 539, 85 S.Ct. 1628, 1631, 14 L.Ed.2d 543, 548, reh. denied, 382 U.S. 875, 86 S.Ct. 18, 15 L.Ed.2d 118 (1965), which subordinated the right of the press "to the maintenance of absolute fairness in the judicial process."
We turn then to the question of whether the public has a right to be present during that part of courtroom proceedings which the defendant, in order to safeguard his Sixth Amendment right to trial by an impartial jury, seeks to have held in camera. It is well settled that there is no constitutional right to be present during all activities of the executive, legislative and judicial branches of government. In Zemel v. Rusk, 381 U.S. 1, 17, 85 S.Ct. 1271, 1281, 14 L.Ed.2d 179, 190, reh. denied, 382 U.S. 873, 86 S.Ct. 17, 15 L.Ed.2d 114 (1965), the Court noted:
[T]he prohibition of unauthorized entry into the White House diminishes the citizen's opportunities to gather information he might find relevant to his opinion of the way the country is being run, but that does not make entry into the White House a First Amendment right.
So, too, the Supreme Court in Branzburg v. Hayes commented:
Despite the fact that news gathering may be hampered, the press is regularly excluded from grand jury proceedings, our own conferences, the meetings of other official bodies gathered in executive *175 session, and the meetings of private organizations. Newsmen have no constitutional right of access to the scenes of crime or disaster when the general public is excluded, and they may be prohibited from attending or publishing information about trials if such restrictions are necessary to assure a defendant a fair trial before an impartial tribunal. [408 U.S. at 684-685, 92 S.Ct. at 2658, 33 L.Ed.2d at 641]
The use of in camera hearings is well established as an integral part of judicial proceedings. We have recognized its proper use when exercised by the trial judge in his sound discretion. In re National Broadcasting Company, 64 N.J. 476, 479 (1974). In In re Presentment of Essex County Grand Jury, 46 N.J. 467, 474 (1966), this Court approved the use of an in camera hearing to allow a public official to introduce evidence to dissipate the factual basis for a grand jury censure. R. 3:6-9(c). So, too, where a witness refuses to answer questions before a grand jury which he believes self-incriminating, the hearing before the Court is held in camera to protect the secrecy of the grand jury proceedings. See R. 3:6-6(a) which enumerates those persons who may be present while the grand jury is in session.
It has been common practice, as the majority notes, to conduct sidebar conferences during trials among counsel and the court so that the jury may not hear arguments, including offers of proof, in order to preserve the jury's impartiality.[7] The public is not privy to these conferences, which in effect are in camera. Entire proceedings in the Juvenile and Domestic Relations Court are held in camera. R. 5:9-1(a) requires that in the best interest of the juvenile, every hearing shall be conducted in private. R. 5:5-1(b) provides that hearings and trials may, in that court's discretion, be conducted in private in any matrimonial matter and in any matter affecting *176 children. In custody determinations the testimony of a child may be taken privately in chambers. Moreover, the United States Supreme Court has approved in camera hearings "to afford Presidential confidentiality the greatest protection consistent with the fair administration of justice." United States v. Nixon, 418 U.S. 683, 715, 94 S.Ct. 3090, 3111, 41 L.Ed.2d 1039, 1068 (1974). The Court also commented:
It is elementary that in camera inspection of evidence is always a procedure calling for scrupulous protection against any release or publication of material not found by the court, at that stage, probably admissible in evidence and relevant to the issues of the trial for which it is sought. [418 U.S. at 714, 94 S.Ct. at 3110, 41 L.Ed.2d at 1067]
The State Trial Judge's Book (2d ed. 1969), published under the sponsorship of the National Conference of State Trial Judges, recommends that criminal pretrial hearings may properly be closed where the defendant has so moved or consented to the court's or prosecution's suggestion that this is necessary to protect the defendant's Sixth Amendment rights. Id. at 265. The authors have written:
When, after consideration, it is concluded that a pretrial hearing is to be held, exclusion of media representatives as well as the general public is essential because, notwithstanding the power and duty of the trial judge to warn concerning the impropriety of publishing evidence presented at such a hearing, and notwithstanding the willingness of some reporters to withhold prejudicial information disclosed until the completion of the trial, not all reporters are willing to do so, and there is serious doubt whether a reporter's violation of an agreement to delay publication constitutes contempt. [Id., footnote omitted]
The American Bar Association Project on Standards For Criminal Justice in its Fair Trial and Free Press (Approved Draft 1968), has adopted criteria which provide for in camera *177 proceedings in criminal cases. Two pertinent standards are 3.1 and 3.5(d). Standard 3.1 states:
Motion to exclude public from all or part of pretrial hearing.
In any preliminary hearing, bail hearing, or other pretrial hearing in a criminal case, including a motion to suppress evidence, the defendant may move that all or part of the hearing be held in chambers or otherwise closed to the public on the ground that dissemination of evidence or argument adduced at the hearing may disclose matters that will be inadmissible in evidence at the trial and is therefore likely to interfere with his right to a fair trial by an impartial jury. The motion shall be granted unless the presiding officer determines that there is no substantial likelihood of such interference. With the consent of the defendant, the presiding officer may take such action on his own motion or at the suggestion of the prosecution. Whenever under this rule all or part of any pretrial hearing is held in chambers or otherwise closed to the public, a complete record of the proceedings shall be kept and shall be made available to the public following the completion of trial or disposition of the case without trial. Nothing in this rule is intended to interfere with the power of the presiding officer in any pretrial hearing to caution those present that dissemination of certain information by any means of public communication may jeopardize the right to a fair trial by an impartial jury.
Standard 3.5(d) reads as follows:
Exclusion of the public from hearings or arguments outside the presence of the jury.
If the jury is not sequestered, the defendant shall be permitted to move that the public be excluded from any portion of the trial that takes place outside the presence of the jury on the ground that dissemination of evidence or argument adduced at the hearing is likely to interfere with the defendant's right to a fair trial by an impartial jury. The motion shall be granted unless it is determined that there is no substantial likelihood of such interference. With the consent of the defendant, the court may take such action on its own motion or at the suggestion of the prosecution. Whenever such action is taken, a complete record of the proceedings from which the public has been excluded shall be kept and shall be made available to the public following the completion of the trial. Nothing in this recommendation is intended to interfere with the power of the court, in connection with any hearing held outside the presence of the jury, to caution those present that dissemination of specified information by any means of public communication, prior to the rendering of the verdict, may jeopardize the right to a fair trial by an impartial jury.
*178 The in camera device is available and should be utilized with the defendant's consent, or at his request, to protect his Sixth Amendment rights during pretrial and trial proceedings with respect to those matters which the jurors or prospective jurors should not hear and which may reasonably be deemed to affect their impartiality. All such data, of course, will be made public either during or at the conclusion of the trial. The press will therefore be able to fully serve the public with its critique of the record when it is disclosed.
Other than as supplemented and modified by what has been stated herein, I concur in the majority opinion and join in its judgment.
Justice MOUNTAIN joins in this opinion.
MOUNTAIN, PASHMAN and SCHREIBER, J.J., concurring in the result.
For reversal  Chief Justice HUGHES, Justices MOUNTAIN, SULLIVAN, PASHMAN, CLIFFORD and SCHREIBER and Judge CONFORD  7.
For affirmance  None
NOTES
[1] A sequestered jury is one which by court order (R. 1:8-6) is isolated from nonjudicial communications and contacts during all or part of a trial and until it has rendered its verdict.
[2] Following the recent retrial of a murder case in this State, a newspaper article reported that the estimated costs of sequestration of the jury were $75,000.
[3] It would also be required that the transcript of the in camera hearing be made available to the public following the completion of the trial.
[1] At least in State v. Hughes and Thompson our decision may have an actual impact on the litigants. Because the trial judge's order extended until the jury presented its verdict, it might be argued that the subsequent mistrial failed to terminate the court's prohibition of publication. Cf. State v. Reddick, 76 N.J. Super. 347, 351 (App. Div. 1962); Farrell v. Weisman, 108 N.J.L. 458, 461 (Sup. Ct. 1932).
[2] First Amendment rights to freedom of speech and the press are applicable to the states through the Fourteenth Amendment. Stromberg v. California, 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1931); Fiske v. Kansas, 274 U.S. 380, 47 S.Ct. 655, 71 L.Ed. 1108 (1927). Similarly, the Sixth Amendment right to an impartial jury extends to state trials through the Fourteenth Amendment. Duncan v. Louisiana, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968).
[3] In Near v. Minnesota, supra, the Court also noted that

the primary requirements of decency may be enforced against obscene publications. The security of the community life may be protected against incitements to acts of violence and the overthrow by force of orderly government. The constitutional guaranty of free speech does not "protect a man from an injunction against uttering words that may have the effect of force." These limitations are not applicable here.
[283 U.S. at 716, 51 S.Ct. at 631, 75 L.Ed. at 1367.]
However, as Justice Brennan explained in Nebraska, these exceptions have been interpreted as not involving "speech" protected by the First Amendment. 427 U.S. at 590, 96 S.Ct. at 2817, 49 L.Ed.2d at 716. Hence, regardless of the propriety of that characterization, they cannot be used as a justification for extending the permissible scope of prior restraints.
[4] The Court noted that the articles there contained facts which were not proven at trial. One report stated that the death sentence was being sought "for the construction worker accused of brutally beating to death his estranged wife...." It also published that the police had quoted the defendant as saying "You've got me for murder. I don't desire to tell you anything." 43 N.J. at 383. Another paper reported that the defendant "had been arrested at least 10 times before and had once threatened to `kill a cop.'" Id. at 384.
[5] As Justice Brennan concluded in Nebraska:

A judge importuned to issue a prior restraint in the pretrial context will be unable to predict the manner in which the potentially prejudicial information would be published, the frequency with which it would be repeated or the emphasis it would be given, the context in which or purpose for which it would be reported, the scope of the audience that would be exposed to the information or the impact, evaluated in terms of current standards for assessing juror impartiality, the information would have on that audience.
[427 U.S. at 590-600, 96 S.Ct. at 2822, 49 L.Ed.2d at 721-722; footnotes omitted]
[6] The question of closing proceedings to the public in juvenile cases appears to be left open by the United States Supreme Court's opinion in Oklahoma Publishing Co. v. District Court In and For Oklahoma County, supra. There the Court rejected the argument that because juvenile proceedings could be closed to the public under state law, the press did not have the right to print information which had, in fact, been made available to the public. 430 U.S. 308, 97 S.Ct. 1045. Similarly, in discussing whether damages might lie for invasion of privacy engendered by the publishing the name of a deceased rape victim, the Court in Cox Broadcasting Corp. v. Cohn, 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975) stated that it meant to "imply nothing about any constitutional questions which might arise from a state policy not allowing access by the public and press to various kinds of official records, such as records of juvenile court proceedings." Id. at 497, 95 S.Ct. at 1047, 43 L.Ed.2d at 350.
[7] Although the distinction between responsible press coverage and inflammatory reporting has been carefully enunciated in the jury prejudice cases, see Sheppard v. Maxwell, supra; Estes v. Texas, supra; State v. Van Duyne, supra, it cannot be dealt with on the basis of prior restraints. It is clear that it would be unconstitutional to restrain publication simply because it is thought that the information might be made public in an objectionable manner.
[8] Counsel must play an active role in making certain that prejudiced persons are excluded. While a juror will not be excused for cause merely because he states that he has seen news reports concerning the case, State v. Collins, 2 N.J. 406 (1949); State v. LaRocca, 81 N.J. Super. 40, 43 (App. Div. 1963), the defense may be held to have waived any objections to a juror if it does not exercise a peremptory challenge. State v. LaRocca, supra.
[9] Under the Court's holding in Groppi v. Wisconsin, 400 U.S. 505, 91 S.Ct. 490, 27 L.Ed.2d 571 (1971) a defendant must be given an opportunity to show that a change of venue is required because of community prejudice.
[10] Where the State seeks to punish the press after publication, the same concern with prior restraints is not present. New York Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); Time, Inc. v. Firestone, 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976). In Near v. Minnesota, supra, the Court stated: "[t]here is also conceded authority of courts to punish for contempt when publications directly tend to prevent the proper discharge of judicial functions." 283 U.S. at 715, 51 S.Ct. at 631, 75 L.Ed. at 1367. However, the Court has taken a critical attitude toward such actions, and the State must show that the press' action constitute a "clear and present danger to the administration of justice." Wood v. Georgia, 370 U.S. 375, 82 S.Ct. 1364, 1369, 8 L.Ed.2d 569 (1962). See also Craig v. Harney, supra; Bridges v. California, supra.
[11] Various criticisms of this alternative have been advanced: that it may "have the capacity to generate animosity against the defendant," United States v. Schiavo, supra, 504 F.2d at 23 (Aldisert, J., dissenting), Comment, "Sequestration: A Possible Solution To the Free Press-Fair Trial Dilemma," supra, 23 Am. U.L. Rev. at 932-933; and that it may produce quick verdicts, United States v. Acuff, 410 F.2d 463, 467 (6 Cir.1969). However, the correctness of these observations has been debated. Compare Comment, "Sequestration: A Possible Solution to the Free Press-Fair Trial Dilemma, supra, 23 Am. U.L. Rev. at 934-935, with "Report of Supreme Court Committee on Criminal Procedure Sub-committee on Jury Deliberations," 95 N.J.L.J. 355 (1972).
[12] Nevertheless, while the Supreme Court has held that the Sixth Amendment may not guarantee the public the right to an open trial, Estes v. Texas, supra, 381 U.S. at 538, 85 S.Ct. at 1631, 14 L.Ed.2d at 548, many courts have found that the public has a cognizable interest in keeping trials open. See United States ex rel. Mayberry v. Yeager, 321 F. Supp. 199, 204 (D.N.J. 1971); United States v. Kobli, 172 F.2d 919, 924 (3 Cir.1949); United States v. Sorrentino, 175 F.2d 721, 722-23 (9 Cir.1949), cert. den. 338 U.S. 868, 70 S.Ct. 143, 94 L.Ed. 532, reh. den. 338 U.S. 896, 70 S.Ct. 238, 94 L.Ed. 551 (1949); Lewis v. Peyton, 352 F.2d 791, 792 (4 Cir.1965); United States v. American Radiator & Standard San. Corp., 274 F. Supp. 790 (W.D. Pa. 1967); Phoenix Newspapers, Inc. v. Superior Court, 101 Ariz. 257, 418 P.2d 594 (en banc 1966); Oxnard Publishing Co. v. Superior Court, 68 Cal. Rptr. 83 (Ct. App. 1968); Kirstowsky v. Superior Court, 143 Cal. App.2d 745, 300 P.2d 163 (Ct. App. 1956); Oliver v. Postel, 30 N.Y.2d 171, 331 N.Y.S.2d 407, 282 N.E.2d 306 (1972); People v. Holder, 70 Misc.2d 31, 332 N.Y.S.2d 933 (Sup. Ct. 1972).
[13] Although presumably broader than any in camera order contemplated by the members of this Court, an order closing the courtroom to the press and the public was struck down by the court in Oliver v. Postel, supra, specifically on First Amendment grounds. Assuming that the First Amendment would limit a court's ability to exclude the press and the public from the courtroom, it is unlikely that these concerns would be vitiated by a requirement that transcripts of the closed proceedings be made available to the public after the jury returned with a verdict. See ante at 144 of 72 N.J. As Professor Bickel has noted: "it is the hypothesis of the First Amendment that injury is inflicted on our society when we stifle the immediacy of speech." Bickel, The Morality of Consent 61 (1975). Similarly, this same attitude was expressed, specifically in the trial context, in Bridges v. California:

It must be recognized that public interest is much more likely to be kindled by the event of the day than by a generalization, however penetrating, of the historian or scientist. Since they publish utterances made during the pendency of a case, the judgments below therefore produce their restrictive results at the precise time when public interest in the matters discussed would naturally be at its height. Moreover, the ban is likely to fall not only at a crucial time but upon the most important topics of discussion.
[314 U.S. at 268, 62 S.Ct. at 196, 86 L.Ed. at 206, (emphasis supplied)]
[1] The majority assumes that trial courts will seldom be confronted with a situation where consideration must be given to the use of in camera procedure. In most criminal trials, some aspect or phase must be held outside the presence of the jury. The trial court will not know whether a reporter will be in the courtroom and, if so, whether the proceeding will be newsworthy.
[2] The Fourteenth Amendment has been interpreted to restrict, in the same manner as Congress is restricted, state action which would abridge these freedoms. Duncan v. Louisiana, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491, reh. denied, 392 U.S. 947, 88 S.Ct. 2270, 20 L.Ed.2d 1412 (1968).
[3] See "Or of the Press," Address of Mr. Justice Potter Stewart, Yale Law School Sesquicentennial Convocation (November 2, 1974).
[4] Alexander Hamilton, by implication, seems to have concurred. The Federalist No. 84, at 580n. (J. Cooke ed. 1961).
[5] In his address the Justice quoted Thomas Carlyle, who wrote:

Burke said there were Three Estates in Parliament; but, in the Reporters' Gallery yonder, there sat a Fourth Estate more important far than they all. It is not a figure of speech or witty saying; it is a literal fact  very momentus to us in these times.
Mr. Justice Stewart continued:
For centuries before our Revolution, the press in England had been licensed, censored, and bedeviled by prosecutions for seditious libel. The British Crown knew that a free press was not just a neutral vehicle for the balanced discussion of diverse ideas. Instead, the free press meant organized, expert scrutiny of government. The press was a conspiracy of the intellect, with the courage of numbers. This formidable check on official power was what the British Crown had feared  and what the American Founders decided to risk.
It is this constitutional understanding, I think, that provides the unifying principle underlying the Supreme Court's recent decisions dealing with the organized press.
[6] N.J.S.A. 10:4-6 et seq. Compare the Freedom of Information Act, 5 U.S.C. § 552, which provides non-confidential government records must be made available to any citizen.
[7] Although R. 1:2-1 generally calls for trials and motions to be held in open court, the rule has been dispensed with where its adherence may result in an injustice. R. 1:1-2. See State v. Jackson, 43 N.J. 148, 163-164 (1964), cert. denied, 379 U.S. 982, 85 S.Ct. 690, 13 L.Ed.2d 572 (1965).