205 N.J. Super. 558 (1985)
501 A.2d 583
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
GEORGE JASUILEWICZ, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued October 29, 1985.
Decided December 4, 1985.
*561 Before Judges PRESSLER, DREIER and BILDER.
Jacqueline Turner, Assistant Deputy Public Defender, argued the cause of appellant (Thomas S. Smith, Acting Public *562 Defender, attorney; Peter B. Meadow, Assistant Deputy Public Defender, of counsel and on the brief).
Jay Hindman, Deputy Attorney General, argued the cause for respondent (Irwin I. Kimmelman, Attorney General of New Jersey, attorney; Mr. Jay Hindman, of counsel and on the brief).
The opinion of the court was delivered by DREIER, J.A.D.
Defendant has appealed from convictions for murder, N.J.S.A. 2C:11-3, third degree aggravated assault, N.J.S.A. 2C:12-1b(2), and possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4d. He was sentenced to a term of 30 years with a 15 year parole ineligibility on the murder charge[1], and to concurrent four year terms on the aggravated assault and possession counts and was also assessed a $25 Violent Crimes Compensation Board penalty on each count.
The offense need only briefly be described. Defendant killed his mother by stabbing her 21 times. He then threatened his brother with the knife, but the brother was able to escape the family home and summon the authorities who found defendant sitting on the roof of the house with his hands in his lap, his head down and with blood on his arms, face and clothes. He was 31 years old at the time of the killing and obviously a severely disturbed person. His psychiatric problems had been evident since he was 16 or 17, and he had prior convictions for inhaling cleaning fluids, carrying a weapon and violation of probation for continuing to sniff paint thinners. The defense psychiatrist, Dr. Kuvin, testified at the competency and the *563 Khan hearings[2] and at trial. He found that defendant suffered from organic brain tissue damage and was "so mentally impaired that he cannot appreciate the fact that he is mentally impaired." He diagnosed defendant as suffering from a psychotic disorder akin to schizophrenia. Defendant heard voices in his head and believed that voices caused by "voo-doo" were speaking to him from the television, radio and records. Part of this delusion was the thought that his mother was involved in a conspiracy against him to ruin his life and was in the pay of the governor and mayor in a plot to invade his privacy, and that the conspiracy caused him to be spied on electronically. He constructed an electronic device to locate microphones he believed his mother was planting in his room and wrote letters concerning this delusion with copies to the United States Supreme Court, the United States Secret Service, the F.B.I. and other government agencies and officials. He previously had threatened to kill both his mother and his brother and there had been at least one violent incident two years before the homicide in which defendant had smashed furniture within the house.
After the homicide, and in spite of the overwhelming evidence, defendant denied murdering his mother, blaming the crime upon his brother. He was adamant that he had not committed the act and that he was not insane. At trial he reiterated the denial and further denied preparation of letters in his own handwriting that strongly indicated his mental instability. Only after hearing Dr. Kuvin's testimony concerning defendant's psychiatric problems and explaining of defendant's memory and thought delusions including that his brother Dan had committed the homicide, as well as the "massive denial phenomenon" that caused him to believe that he was not mentally ill, did defendant allow his attorney to proceed with the insanity defense.
*564 Jury selection in this trial began June 21, 1982. On the same date the jury in the trial of John Hinckley, Jr. for the attempted assassination of President Reagan, was in its fourth day of deliberation and that evening reached its verdict of not guilty by reason of insanity. Jury selection in the case before us was concluded on the morning of June 22, 1982 and the trial took three days, with the verdict announced on the morning of June 25, 1982. During this entire period the newspapers, radio and television resounded with accounts of the Hinckley verdict and denouncements of the acquittal of a defendant who attempted to assassinate and succeeded in grievously wounding the President of the United States. The trial judge was well aware of the Hinckley publicity, since statements by him out of the jury's presence concerning that case appear frequently throughout the transcript. He stated, however, that he was "going to stay away from" the Hinckley case to avoid "earmarking" the case in the minds of the jury during the voir dire. Although questions during the voir dire touched on the issue of insanity, the name "John Hinckley" was never mentioned. Rather, the questions asked were whether the jurors were asked whether they had mental problems, whether members of their families had been treated for mental problems, whether they had taken a course in psychology or psychiatry and whether they or members of their families had worked in a psychiatric or mental hospital. As will be noted hereafter, this questioning was grossly inadequate, given the tenor of the times. The judge's final charge to the jury contained three references to the Hinckley case. He stated:
Thank you, Mr. Prosecutor. Ladies and gentlemen, I am going to ask you to rise with me. Some of the people's eyes are getting closed, and I want to have all of you awake when I talk to you. The reason I am doing this, ordinarily I would take a break but, ladies and gentlemen, there is some law that I have to read to you, and it is my policy to give it to you right away so I am just asking you to stretch for a moment, and the reason for it particularly is, if you know, I avoided talking about it so far in the case that occurred in Washington. Each morning I was confronted with the lawyers saying look what the Ledger has and the Times. Ladies and gentlemen, that is beyond my control, that I hope that that case has no part in your thinking.

*565 Ladies and gentlemen, first of all, before I even start, I just want to let you know that the standards they use in Washington, D.C. are completely different than the standards of law we have here in New Jersey. It is completely different. I know that you have seen and you have heard some repercussions by the Attorney General of the United States, and the other people for and against that case. That has no part, ladies and gentlemen. That is a rather unusual case, and I think all of us who understand the law know that it is completely different from the law here in New Jersey.
Later the court stated,
... Now, ladies and gentlemen, and again I have to be very cautious with you. Again that you and I have been confronted this week, and I mention it now, and I did mention it all week of the trial in Washington. Again, I told you at the very beginning, it has no part in this case, ladies and gentlemen. The standards used there are completely different from ours. I have my own thought on that case, but that is not important, and I hope and I pray that all of you do not consider that case to have any part in this case here at all. All right? That is for  not because I can't very well tell you to erase it out of your mind. We discussed this, both the Prosecutor and Mr. Graves. But every morning you have on television, you heard it. You read the paper and in the afternoon you heard it. Anyway, that is a case in Washington. We here in Newark, New Jersey are deciding a different case. All right? Because here in New Jersey, ladies and gentlemen, our standards are a lot different.
At the end of the third day of trial there was another brief (three sentence) reference to the Hinckley trial:
Now ladies and gentlemen, I would like to  I have stayed away purposely to avoid talking about a sensational trial we heard in Washington. I know last night when I looked at the television, I heard it, and you will hear a great deal of it again today. You are not to in any way be prejudiced by this.

I

PRE-VERDICT PUBLICITY
In the face of substantial publicity (whether or not concerning the trial itself,) it is well settled that a criminal defendant is entitled to an impartial jury. Sheppard v. Maxwell, 384 U.S. 333, 362-63, 86 S.Ct. 1507, 1522, 16 L.Ed.2d 600, 620 (1966); State v. Williams, 93 N.J. 39, 60 (1983). The rule should be no different where the publicity concerns outside events which might bear upon the trial. The trial judge here acknowledged that the jury had been and was being subjected to the extensive publicity concerning the Hinckley case. We assume, as did he, that he could not have obtained a jury *566 untainted by the pervasive publicity accompanying the Washington proceedings. The principal question before the court should have been whether the proceedings still could have been conducted in a fundamentally fair manner before an impartial jury.
In approaching the question of shielding a jury from press publicity, our Supreme Court in State v. Allen, 73 N.J. 132, 141-145 (1977), suggested several alternate methods for protecting the jury from outside influences. Although the First Amendment issues were later reconsidered in State v. Williams, supra, 93 N.J. at 48 the Williams redefinition does not affect the alternatives available to insulate a jury from the adverse effects of publicity. If the publicity is expected to occur during the trial a jury may be sequestered (although this procedure is not favored), and clear and definitive instructions to refrain from reading or listening to media reports can be given. The Allen suggestion of limited in camera hearings was even further circumscribed in Williams, 93 N.J. at 63-67. If the offending material is the subject of pretrial publicity,
the trial court has available additional means such as (a) adjournment of the trial to allow public attention to subside, (b) change of venue, (c) foreign jury, (d) searching questioning of prospective jurors to screen out those infected by pretrial publicity and, (e) emphatic and clear instructions to the jury to decide the issues only on evidence presented in open court. See Sheppard v. Maxwell, supra. 384 U.S. at 357-362. 86 S.Ct. at 1519-1522, 16 L.Ed.2d at 617-620; Nebraska [Press Assoc. v. Stuart, 427 U.S. [539,] 563. 96 S.Ct. [2791,] 2808, 49 L.Ed.2d [683,] 700. (73 N.J. at 145).
In Williams, the court, after discussing other alternatives, specifically focused upon consideration of "the efficacy of more exhaustive and searching voir dire examinations," and being "particularly responsive to the requests of counsel regarding the examination of prospective jurors as to potential bias," even to the point of "a greater willingness to resolve doubts in favor of the defendant in excusing jurors for cause." (93 N.J. at 68).
In this case the trial judge chose not to adjourn the matter to let the publicity subside. Although there appeared to have been little likelihood that the issue would have been out of the *567 public view within a reasonable period or that any jury would be free of a sustained taint caused by the intensity of the publicity, this relief could have been combined with other remedies. For obvious reasons, a change of venue would have been unavailing. A sequestered jury would not have solved the problem of the initial publicity, and would have presented all of the problems noted in Allen. We are left, therefore, with the sole practical means of conducting the trial to be as stated in Allen, the "searching, questioning of prospective jurors to screen out those infected by pretrial publicity" (and even the continuing publicity during the trial), and "emphatic and clear instructions to the jury to decide the issues only on evidence presented in open court." As reiterated in Williams, "the court should also be mindful of the need to fashion effective cautionary jury instructions and to increase the frequency of their application."
In this unusual situation, since the judge could not have been expected to select a jury untainted by the publicity, he should have at least insured that the jury he did obtain was untainted by prejudice caused by that publicity. Unfortunately, he failed to do so. Defendant repeatedly requested a voir dire concerning the effect upon each juror of the Hinckley publicity. These requests were denied. Not only were there no "searching" questions, there were no questions at all. The instructions quoted earlier, although directing the jury to apply the different standards applicable in New Jersey, were insufficient. The court and parties needed to know whether the individual jurors, acknowledged to be tainted by the publicity, had formed any prejudice against the insanity defense in general or a fixed opinion as to this defendant's guilt or innocence as a result of the extra-judicial influences and whether they could still be guided by the court's instructions. Insofar as the problem existed at the time of the voir dire, this information should have been unearthed so that the defendant could have exercised either cause or peremptory challenges as the situation required.
*568 As the trial progressed and noting that the publicity continued unabated, the judge should have held an additional voir dire prior to his final charge and jury deliberation. Such a procedure is not unusual where in the midst of a trial a single potentially damaging statement has been made in one of the media. Jurors are often questioned as to whether any of them has heard or seen the offending statement and, if so, whether the statement would in any way influence the juror's capacity to deliberate and render a fair and impartial verdict. State v. Reddy, 130 N.J. Super. 14 (Law Div. 1974), aff'd 137 N.J. Super. 32, 37-38 (App.Div. 1975). As noted in Pressler, Current N.J. Court Rules, Comment to R. 1:16-1 (1985):
While the rules is drawn in terms of a post-verdict interrogation of jurors, the technique provided by the rule for determining juror taint is obviously applicable during the course of the trial as well when a circumstance arises suggesting that a juror may in fact be tainted. In that situation the trial court, upon being apprised of such a circumstance, is obliged to interrogate the juror in the presence of counsel and to determine if there is a taint and if so, if any other jurors have been infected thereby. If the court does find a taint, it must then determine, as assuming a sufficient number of jurors remain, whether the trial may proceed upon excusing the tainted juror or jurors or whether a mistrial must be declared. If the trial court fails to so proceed and the circumstance is indeed one which is apparently tainting, the taint must be presumed and a new trial ordered.
If a single statement warrants such action, how much more should the action have been warranted when the entire trial proceeded in the face of a constant stream of infectious publicity? The failure to so proceed was reversible error. See State v. Marchitto, 132 N.J. Super. 511, 514-517, (App.Div.), certif. den. 68 N.J. 163 (1975).
Given this situation, we would add a gloss to the suggestions of the Supreme Court in Allen and Williams. Whenever the public tenor is such that a jury may reasonably be expected to be unable to exercise its judgment untainted by a prejudice, the jury should be pre-qualified to screen from the pool those individuals so infected. There is ample precedent for such a procedure in the "death qualified" jury now selected in capital *569 cases. State v. Artis, 57 N.J. 24, 36 (1970); State v. Timmons, 192 N.J. Super. 141, 150 (Law Div. 1983).
In this case the better practice would have been for the matter to have been adjourned if defendant so requested as soon as the Hinckley verdict was returned and the initial wave of publicity against the insanity defense became apparent to the trial judge. After a few weeks or months when the publicity had subsided, if a searching voir dire of potential jurors indicated a pervasive prejudice against the insanity defense, a pre-qualified panel, free of this taint could have been assembled. The polestar in any such process is stated in dictim in In re Kozlov, 79 N.J. 232, 239-40 (1979):
The responsibility of a trial judge, as guardian and exemplar of the pure administration of justice, would require him, while spurning any officious interference with the independence and integrity of the mental processes of a jury ..., to seek out and expose outside factors impinging upon the jury's freedom of action and thus its impartiality and essential integrity. Any matter which would contaminate the latter should invite the aggressive attention and concern of the trial judge for he, above all others is the immediate custodian and steward of justice in the circumstances and the exigencies of the particular case.

II

POST-TRIAL EXAMINATION
Defendant had requested a post-trial interview of jurors pursuant to R. 1:16-1. The trial judge denied the application without an evidentiary hearing. The "good cause" required by R. 1:16-1 to question a juror after a trial must be predicated upon the injection into the deliberation of some outside influence or event or proof a juror who was tainted. See State v. Thompson, 142 N.J. Super. 274, 279 (App.Div. 1976). Evid.R. 41 further prohibits evidence of "the effect of any statement, conduct, event or condition upon the mind of a juror." Jurors must be protected against harassment by a disappointed attorney and, therefore, R. 1:16-1 prescribes "an extraordinary procedure which should be evoked only upon a strong showing that a litigant may have been harmed by jury *570 misconduct." State v. Athorn, 46 N.J. 247, 250 cert. den. 384 U.S. 962, 86 S.Ct. 1589, 16 L.Ed.2d 674 (1966). See also State v. Kociolek, 20 N.J. 92 (1955). As is noted in Pressler, Current N.J. Court Rules, Comment R. 1:16-1 (1985):
It must be further emphasized that the `good cause' intended by the rule is not impropriety or defect in the motives or methods or thought processes by which the jurors reached their verdict but rather that is is some event or occurrence injected into deliberation in which the capacity for prejudice inheres ... Good cause, however, would include information, whether true or false, which is communicated by an outsider to the jurors, or by one juror to others and which is both extraneous to the proofs and sufficiently prejudicial to require a new trial or mistrial if injected into the proofs ...
Good cause does not, however, include the possibility of taint resulting from improper influences where such influence is expressly denied by the juror or voir dire, ... or where the voir dire examination fails to inquire into matters which might tend to make a juror sympathetic to one of the parties, and where the information, had it been elicited, would not have supported a dismissal of a prospective juror for cause ...
The trial judge here determined that such prejudice was not present and we need not inquire further into his decision. This issue is moot since we have determined that the verdict must be set aside for failure to conduct a proper voir dire both initially and at the close of the trial.

III

COMPETENCY TO STAND TRIAL
Defendant next contends that he lacked the competence to stand trial. The standard for a determination of competency has been codified in N.J.S.A. 2C:4-4. Subsection a forbids the trial, conviction or sentencing of a "person who lacks capacity to understand the proceedings against him or to assist in his own defense." Subsection b(1) requires a defendant to be oriented as to time, place and things, and subsection b(2) requires that a defendant's elementary mental processes be such that he comprehends seven factors that bear upon his prosecution:
(a) That he is in a court of justice charged with a criminal offense;
(b) That there is a judge on the bench;

*571 (c) That there is a prosecutor present who will try to convict him of a criminal charge;
(d) That he has a lawyer who will undertake to defend him against that charge;
(e) That he will be expected to tell to the best of his mental ability the facts surrounding him at the time and place where the alleged violation was committed if he chooses to testify and understands the right not to testify;
(f) That there is or may be a jury present to pass upon evidence adduced as to guilt or innocence of such charge or, that if he should choose to enter into plea negotiations or to plead guilty, that he comprehend the consequences of a guilty plea and that he be able to knowingly, intelligently, and voluntarily waive those rights which are waived upon such entry of a guilty plea; and
(g) That he has the ability to participate in an adequate presentation of his defense.
There is no question concerning the first six of these elements, but defendant has alleged that subsection (g) was not satisfied since his amnesia-like delusion prevented him from participating with counsel in his own defense. This factor, however, "is only one of numerous factors to be considered." State v. Coruzzi, 189 N.J. Super. 273, 323 (App.Div.), certif. den. 94 N.J. 531 (1983). Defendant here has three infirmities. He has an unclear recollection of the event; he is delusional (and thus creates factual patterns contrary to apparent fact and reality); he at least initially failed to appreciate the nature of his illness and insisted that defense counsel both present a defense for which there was no factual basis and avoid giving the notice of the insanity and defect defenses required by R. 3:12.
We have no per se disqualification based upon a claim of incomplete recollection, since even complete amnesia has been held not to bar prosecution. State v. Pugh, 117 N.J. Super. 26, 35-36 (App.Div. 1971). A further analysis is necessary, however, since each case must be analyzed on its own merits. The factors for consideration have been compiled in Wilson v. United States, 391 F.2d 460, 463-464 (D.C. Cir.1968), and have been previously adopted in this state in State v. Pacheco, 106 N.J. Super. 173, 179-80 (App.Div. 1969), cert. den. 400 U.S. 834, 91 S.Ct. 68, 27 L.Ed.2d 65 (1970). These factors are:

*572 (1) The extent to which the amnesia affected the defendant's ability to consult with and assist his lawyer.
(2) The extent to which the amnesia affected the defendant's ability to testify in his own behalf.
(3) The extent to which the evidence in suit could be extrinsically reconstructed in view of the defendant's amnesia. Such evidence would include evidence relating to the crime itself as well as any reasonably possible alibi.
(4) The extent to which the Government assisted the defendant and his counsel in that reconstruction.
(5) The strength of the prosecution's case. Most important here will be whether the Government case is such as to negate all reasonable hypotheses of innocence. If there is any substantial possibility that the accused could, but for his amnesia, establish an alibi or other defense, it should be presumed that he would have been able to do so.
(6) Any other facts and circumstances which would indicate whether or not the defendant had a fair trial.
Here the factors weighed heavily in favor of the trial proceeding. There had been the utmost cooperation by the State in reconstructing the events surrounding the crime which clearly demonstrated that defendant had committed the homicide.
The issues remaining on this point concern the defendant's alleged general incompetency caused by his mental problems. These problems seem now to have been partially dissipated by medication and defendant's present awareness of his own unsoundness of mind; but the trial judge when faced with the situation should have, in consultation with defendant's counsel applied standards similar to those utilized for a civil declaration of incompetency. See N.J.S.A. 3B:12-24 et seq.; R. 4:83-1 et seq. The "competency" question in a civil incompetency proceeding is entirely different from a determination of "competency" to stand trial under N.J.S.A. 2C:4-4 (and incidentally, the "competency" to be a witness, Evid.R. 17 and 19). The trial judge after the Khan hearing would have determined whether defendant, although competent to stand trial, was incompetent to withhold permission from his attorney to give notice under R. 3:12 of a defense of insanity pursuant to N.J.S.A. 2C:4-1 or diminished capacity under N.J.S.A. 2C:4-2. State v. Khan, supra, 175 N.J.Super at 82-83. Defendant's sudden acknowledgement of his mental problems in the course *573 of the Khan hearings cut short the inquiry. Thus no determination was made as to whether defendant had the capacity to waive either the insanity or mental defect defenses.
Since we are now directing that the proceedings be recommenced, as noted in Point VII, infra, there should be new hearings on these issues.

IV

EVIDENCE OF DEFENDANT'S MEDICATED STATE
When defendant took the witness stand the jury saw a relatively lucid individual who denied his commission of the crime as well as all incidents of prior violent or bizarre behavior. When a defendant's sanity is in issue the jury is entitled to consider his in-court demeanor as well as his words in appraising his sanity. See Pate v. Robinson, 383 U.S. 375, 385-86, 86 S.Ct. 836, 842, 15 L.Ed.2d 815, 822 (1966); Schmidt v. LaVallee, 445 F. Supp. 1156, 1160 (S.D.N.Y. 1977); Commonwealth v. Louraine, 390 Mass. 28, 453 N.E.2d 437, 442 (1983); J. Wigmore, Evidence § 1160 (Chadbourn Rev.Ed. 1972), p. 357. Where a defendant appears before a jury in an artificially placid state induced by tranquilizers, anti-psychotic drugs or other medication, he has a right to have the jury informed that his demeanor has been altered by medication. State v. Hayes, 118 N.H. 458, 389 A.2d 1379, 1382 (1978); State v. Jojola, 89 N.M. 489, 553 P.2d 1296, 1300 (1976); In re Pray, 133 Vt. 253, 336 A.2d 174, 177 (1975), and see State v. Maryott, 6 Wash. App. 96, 492 P.2d 239, 242-43 (Ct.App. 1971) where defendant was forced to take medication which visibly altered his demeanor. Here the jury was informed during Dr. Kuvin's testimony of the medication administered to defendant and its effect. These cases are, therefore, inapposite, except that here the subject was apparently overlooked in the court's charge. The court, however, did give a general charge as to credibility which mentioned that the jurors "must take into account the demeanor of the witness on the stand." Where there is no disagreement *574 that such demeanor has been artificially altered, the court should consider whether to comment on this fact as part of the charge. Counsel has asserted that more emphasis should have been placed upon the effects of defendant's psychotropic medication, and that evidence of how defendant acts in an unmedicated state (presumably videotaped) should be permitted. We choose to leave the resolution of such issues to the trial judge upon retrial of this matter, dependent upon the development of the issue in the new trial setting.

V

INSTRUCTIONS CONCERNING DIMINISHED CAPACITY
Although not raised below, defendant asserts as plain error that the trial judge failed to charge concerning the affirmative defense of diminished capacity, i.e., that although defendant may not have been insane, he suffered from a mental disease or defect, admissible to prove that he lacked the requisite state of mind to have committed murder. N.J.S.A. 2C:4-2. The State asserts that not only did defendant fail to request the specific charge, but the issue itself could not be injected, since defendant failed to give the required pretrial notice of his intention to rely on this defense. R. 3:12; State v. Burnett, 198 N.J. Super. 53, 58-62 (App.Div. 1984).
As noted earlier, the lack of notice in no way prejudiced the State, and the Khan hearing terminated before the trial judge had to reach the issue of defendant's lack of capacity to waive the insanity defense. It should have been apparent that defendant's mental condition would be at the core of this case, notwithstanding his delusional assertions that he had not committed the homicide. R. 3:12 itself does not require exclusion of either an insanity or a diminished capacity claim; it provides only that for failure to comply with the rule, "the court may take such action as the interest of justice requires." In this case, the interest of justice required that the issue be placed before the jury.
*575 A judge must instruct the jury as to the law governing the issues to be decided under the facts of a particular case. State v. Butler, 27 N.J. 560, 596 (1958). This issue is unlike the situation in State v. Choice, 98 N.J. 295, 299 (1985) where the recognition of the new issue would have required the trial court "on its own meticulously to sift through the entire record" to determine whether the issue properly was before the jury. If, upon retrial, the facts support the issue of diminished capacity, such a charge should be given.

VI

ADMISSION OF VICTIM'S PHOTOGRAPH
The trial judge admitted a color photograph of the nude body of the victim taken the day after the murder. The State had already placed in evidence three photographs of the victim taken at the scene of the crime all of which indicated the multiple stabbing. The balance of the evidence in the case, including the eyewitness testimony of defendant's brother clearly showed the brutal nature of the act. It strains the discretion granted by Evid.R. 4 to say that the trial judge properly could have admitted this photograph for any valid purpose. This is not a case where notwithstanding defendant's concession as to the nature of the slaying, the State still would be free to prove the element of brutality. State v. Laws, 50 N.J. 159, 184 (1967), cert. den. 393 U.S. 971, 89 S.Ct. 408, 21 L.Ed.2d 384 (1968). In this case the photograph appears to be cumulative, notwithstanding the State's assertion that the three photographs of the victim already in evidence "did not clearly depict the position of Mrs. Jasuilewicz's stab wounds, which was the purpose of admitting the photograph at issue." If, upon reflection, the trial judge on retrial determines that this photograph is properly admissible, we suggest that the limitations described in State v. Polk, 164 N.J. Super. 457, 465 (App. Div. 1977) might be applied and a black and white photograph substituted. We reiterate that this procedure should only be *576 used if there is a basis to admit the photograph at all. See also State v. Bucanis, 26 N.J. 45, 54 (1958), cert. den. 357 U.S. 910, 78 S.Ct. 1157, 2 L.Ed.2d 1160 (1958).

VII

SENTENCE
Since we have directed a retrial, the issue of excessiveness of sentence is moot. We merely note that the judge entered a statement of reasons in which he stated his "very strong duty to protect society, and protect the defendant from the criminal propensities that would arise if he was here in society." The mitigating factors raised by defendant have little merit. The "strong provocation" described in N.J.S.A. 2C:44-1b(3), urged by defendant as a mitigating factor, relates to the conduct of the victim towards the actor, a factor totally lacking in this case. Defendant's alleged psychotic compulsion and paranoid delusions also have no relevance in this context.

VIII

COMPETENCY HEARING UPON RETRIAL
We have noted earlier that the court held a competency and Khan hearing prior to the commencement of the trial. Three and one-half years have elapsed since that hearing, and we have no way of knowing whether defendant's psychiatric condition has improved, worsened or remained stable. Having examined the record of the first hearing and the trial testimony concerning defendant's psychiatric problems, we direct that new competency hearings be held prior to any retrial of defendant.
Defendant's conviction is reversed and this matter is remanded to the Law Division for further proceedings in accordance with this opinion. We do not retain jurisdiction.
NOTES
[1] The amendment to N.J.S.A. 2C:11-3b increasing the penalty for murder to either 30 years without parole or such term between 30 years and life imprisonment as the court might set with a minimum parole ineligibility of 30 years or more, although effective on the date of sentencing, was not enacted until 5 1/2 months after this offense. L. 1982, c. 111 § 1, eff. August 6, 1982.
[2] See State v. Khan, 175 N.J. Super. 72 (App.Div. 1980), requiring a hearing to determine whether defendant is mentally competent to waive the insanity defense.