901 A.2d 445

GERALD COHEN, PLAINTIFF–APPELLANT, v. COMMUNITY MEDICAL CENTER, DR. DAVID CHONG, DR. IAN SAMSON, DR. PIER LUIGI PIERONI, AND LAKEWOOD SURGICAL GROUP, DEFENDANTS–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued October 19, 2005—Decided June 30, 2006.

388

Before Judges STERN, GRALL and SAPP–PETERSON.

*Brian D. Drazin* argued the cause for appellant (*Drazin & Warshaw*, attorneys; *Mr. Drazin*, on the brief).

*Joseph J. Garvey* argued the cause for respondents Community Medical Center and David Chung, M.D. (*Garvey, Ballou & Van Dyke*, attorneys; *Peter J. Van Dyke*, on the brief).

*Paul F. Schaaff, Jr.* argued the cause for respondents Ian Samson, M.D., Pier Luigi Pieroni, M.D., and Lakewood Surgical Group (*Orlovsky, Moody, Schaaff & Gabrysiak*, attorneys; *Mr. Schaaff,* of counsel; *Jill R. O'Keeffe,* on the brief).

*Locks Law Firm,* attorneys for amicus curiae Association of Trial Lawyers of America, New Jersey Chapter (*Michael A. Galpern,* on the brief).

The opinion of the court was delivered by

SAPP–PETERSON, J.S.C. (temporarily assigned).

In this medical malpractice action, we address prophylactic measures a trial judge should employ when confronted with pretrial and mid-trial publicity. Plaintiff Gerald Cohen appeals from the February 24, 2003, order entering judgment after a jury verdict in favor of defendants Community Medical Center (CMC), David Chung, M.D.[1], Ian D. Samson, M.D., Pier Luigi Pieroni, M.D., and Lakewood Surgical Group (LSG). We now reverse.

On March 9, 1999, plaintiff filed a four-count medical malpractice complaint against CMC and Dr. Chung, alleging they deviated from acceptable standards of care in the diagnosis and treatment of his left foot. The complaint was later amended to add Dr. Samson, Dr. Pieroni, and LSG as defendants. Defendants filed answers to the complaint and upon completion of discovery, trial was scheduled for January 30, 2003.

One week prior to the scheduled trial date, the attorneys for both sides contacted the presiding judge to jointly request a trial adjournment. The request was in response to the anticipated statewide strike in the medical community, slated to commence on February 3, 2003. The presiding judge denied the request, believing that concerns of potential bias that might flow from the

---

[1] Improperly pled as Dr. David Chong.

doctors' impending strike could be effectively addressed through voir dire.

Jury selection commenced on January 30, 2003. On that same day, the lead story on the front page of the *Ocean County Observer* edition of the *Asbury Park Press* was an article entitled, "Insurance issue could shut ER." A bullet point under the headline stated, "If Community Medical Center can't secure insurance for its ER doctors, it could be forced to close." Alongside the article was a photograph depicting CMC. Under the photograph was another headline stating, "If Community Medical Center doesn't secure insurance for its emergency department physicians by 11:59 p.m. Friday, the state's busiest ER may be forced to close." The story continued on page four where there were two more articles discussing the doctors' strike; "Southern Ocean doctors will join statewide job action" and "Coalition: Doctors are targeting wrong enemy." All three articles discussed the rising cost of medical malpractice insurance, which doctors attributed to high jury verdict awards in medical malpractice lawsuits, and the impact such awards were having upon doctors' ability to practice medicine. Plaintiff's counsel also alerted the court to a full-page ad, featured in the *Asbury Park Press*.

Just before the panel was brought into the courtroom for voir dire, plaintiff's counsel again raised the issue of the newspaper article that appeared in the *Asbury Park Press* that morning, as well as the fact that the article specifically focused on defendant CMC. He renewed his request for an opportunity to present the issue to the presiding judge, which the judge denied because he believed the issue was really one of impaneling a fair panel, an issue he could address. The judge considered the age of the case and apparently also believed the controversy surrounding the high cost of medical malpractice insurance was not going to change. He therefore concluded an adjournment would not "accomplish anything" because the parties would "face the same problem whether it's tomorrow, today, two weeks down the road or a month down the road." The judge indicated that he would "deal

with the issue when I deal with ... the jury." [2] Plaintiff's counsel responded by pointing out, "today's article focuses on the defendant and the part of the defendant's institution, their emergency room, that is here today. It's much more specific." At that point, defendant Samson's attorney advised the court that Samson had written a letter to the editor of the *Asbury Park Press,* which Samson thought may be published within the next two days.

Although the tape of this discussion is inaudible in part, it appears the judge was also willing to instruct the jurors not to read the letter written by Samson, should it be published. Samson's attorney stated he did not want "to focus upon Samson, so that jurors say he's leading the charge." He told the judge he wanted to think about it. The court agreed "to do whatever counsel want[ed]." Plaintiff's counsel, however, remained steadfast in his position that the jurors should be instructed not to read articles related to the strike and medical malpractice insurance.

The testimonial stage of the trial commenced January 31, 2003. It recessed for the weekend and then resumed the following Monday. On February 6, 2003, the trial was again recessed because of an anticipated snowstorm the next day and because one of the remaining six jurors had a prearranged business trip the following week. The trial resumed on February 19, 2003. The next day, the jury returned a verdict of no cause in favor of all defendants. This appeal followed. We granted the motion of the

---

[2] As part of the jury voir dire, the judge asked each prospective juror whether the juror: (1) had read the article in the *Ocean County Observer* that day about the CMC Emergency Room and impending strike; (2) might be influenced by coverage concerning a medical strike; (3) could accept as a principle of law that if a doctor deviated from a standard of care, the doctor could be held liable to plaintiff for compensatory damages; (4) was related to anyone in the health care industry; (5) had any good or bad experiences with doctors that left a lasting impression, which would affect the juror's ability to be fair and impartial; (6) could decide the case on the law and evidence without prejudice or bias; and (7) whether the juror or family members had any appointments cancelled because of the strike.

New Jersey Chapter of the Association of Trial Lawyers of America (ATLA–NJ) to appear amicus curiae.

Plaintiff and ATLA–NJ raise a number of points on appeal, but we focus on plaintiff's contention that the court failed to give appropriate cautionary instructions. We agree.

Concerns surrounding juror impartiality due to adverse publicity arise in civil as well as criminal trials. Article 1, Paragraph 9 of the New Jersey Constitution "guarantees a civil litigant a right to an impartial jury." *Ward v. Merrimack Mut. Fire Ins. Co.*, 312 *N.J.Super.* 162, 165, 711 *A.*2d 394 (App.Div.1998). *See also Catando v. Sheraton Poste Inn*, 249 *N.J.Super.* 253, 258–59, 592 *A.*2d 294 (App.Div.), *certif. denied*, 127 *N.J.* 550, 606 *A.*2d 364 (1991). Thus, jurors in all cases "must be 'as nearly impartial as the lot of humanity will admit.'" *State v. Fortin*, 178 *N.J.* 540, 575, 843 *A.*2d 974 (2004) (quoting *State v. Williams*, 93 *N.J.* 39, 60, 459 *A.*2d 641 (1983) (*Williams I*)). *See also State v. Jasuilewicz*, 205 *N.J.Super.* 558, 566–67, 501 *A.*2d 583 (App.Div.1985), *certif. denied*, 103 *N.J.* 467, 511 *A.*2d 649 (1986).

Therefore, when possible prejudice to a litigant's right to a fair trial arises as a result of pre-or mid-trial publicity, the trial court has various means available to ensure juror impartiality, such as adjourning the trial to allow public attention to subside, searching and thorough questioning of prospective jurors to screen out those infected by pretrial publicity, and emphatic and clear cautionary instructions. *State v. Williams*, 113 *N.J.* 393, 428–29, 550 *A.*2d 1172 (1988) (*Williams II*); *Jasuilewicz, supra*, 205 *N.J.Super.* at 566, 501 *A.*2d 583 (citing *State v. Allen*, 73 *N.J.* 132, 145, 373 *A.*2d 377 (1977)). We will address only the latter in light of our disposition.

Although the trial judge addressed the impending strike and media coverage in the voir dire, once the jury was impaneled, no additional prophylactic measures were taken to address any continuing publicity. *See State v. Bey*, 112 *N.J.* 45, 89–91, 548 *A.*2d 846 (1988) (*Bey I*). By then, the record reveals media

coverage of the controversy and impending strike had escalated.[3] Yet, the preliminary instructions did not include cautionary instructions or directions concerning the possibility of widespread publicity generated by the impending strike. In addition, after the weekend recess, plaintiff's counsel reported that the publicity had intensified and renewed his request for cautionary instructions. That request was denied, despite the fact several additional articles appeared in area papers over the weekend.[4] Finally, following the thirteen-day recess, plaintiff's counsel requested that the court question jurors about whether they had been exposed to media coverage during the recess. The judge declined to do so. These extraordinary events, albeit not directly related to plaintiff's claims against defendants, so enveloped and haunted the trial that cautionary instructions and directions were required. *See State v. Scherzer,* 301 *N.J.Super.* 363, 487–91, 694 *A.*2d 196 (App.Div.), *certif. denied,* 151 *N.J.* 466, 700 *A.*2d 878 (1997).

The court has an affirmative obligation to seek out and rectify outside influences that have the capacity to create a prejudicial impact upon a party. *In re Kozlov,* 79 *N.J.* 232, 239–

---

[3] The following newspaper headlines appeared in area newspapers on January 30, 2003: *Insurance issue could shut ER: If Community Medical Center can't secure insurance for its ER doctors, it could be forced to close, Ocean County Observer,* January 30, 2003; *Southern Ocean doctors will join statewide job action, Ocean County Observer,* January 30, 2003; *Physicians' take-home pay can't keep up with inflation, Asbury Park Press,* January 30, 2003; *Docs Call Out For State Help, Asbury Park Press,* January 30, 2003; *A tip to patients: Do not get sick, Asbury Park Press,* January 30, 2003; *Patients' advocates: Insurers to blame, Asbury Park Press,* January 30, 2003. *See N.J.R.E.* 201(b), 202(b).

[4] Although counsel did not make reference to the specific articles that appeared over the weekend, we take judicial notice of articles published during the weekend recess: *ERs will augment staffs: Hospitals set for patient influx during doctors' job action, Asbury Park Press,* January 31, 2003; *Doctors entitled to strike, some say, Asbury Park Press,* February 1, 2003; *Some see conflict in health care vote, Ocean County Observer,* February 2, 2003; *Doctors rally for malpractice reforms, Ocean County Observer,* February 2, 2003; Lilo H. Stainton, *Doctors hope job action will deliver a message, Asbury Park Press,* February 2, 2003; *Malpractice protest sends patients to ER, Ocean County Observer,* February 5, 2003. *See N.J.R.E.* 201(b), 202(b).

40, 398 *A*.2d 882 (1979). Even in the absence of any actual impact, the judge must take steps to prevent and mitigate outside influences if a party's right to a fair trial may potentially be affected. *State v. R.D.*, 169 *N.J.* 551, 558, 781 *A*.2d 37 (2001) (quoting *Panko v. Flintkote Co.*, 7 *N.J.* 55, 61, 80 *A*.2d 302 (1951)). Here, that was not done, notwithstanding the real potential of prejudice.

■ We recognize that exposure to publicity about a specific trial, or publicity that may only have an indirect relationship to a trial, neither presumptively creates an unfair trial nor necessarily constitutes grounds for a new trial. *State v. Neulander*, 173 *N.J.* 193, 205, 801 *A*.2d 255 (2002) (quoting *Nebraska Press Ass'n v. Stuart*, 427 *U.S.* 539, 565, 96 *S.Ct.* 2791, 2805–06, 49 *L.Ed.*2d 683, 701 (1976)). In addition, a trial judge cannot insulate the jury from all extraneous influences, but at a minimum, a judge is expected to take prophylactic measures to ensure a fair trial. *See Williams I, supra*, 93 *N.J.* at 62–63, 459 *A*.2d 641.

The record discloses the trial judge gave one cautionary instruction, which occurred during voir dire of the first jury panel on the morning of January 30, 2003:

> THE COURT: So, we'll see everybody else at 1:30. Thank you. Thank you.
>
> . . . .
>
> MR. DRAZIN: Judge, before the jurors file out, there was—
> THE COURT: There's not many left. What's the problem?
> MR. DRAZIN: I thought you were going to give some instructions about—
> THE COURT: Oh. Don't read the newspaper article.[5]

It is unclear from this record how many prospective jurors were still present when the judge cautioned the jurors not to read the article. It is undisputed that a similar cautionary instruction was not given to the second panel of prospective jurors who were brought into the courtroom after the luncheon recess. Additionally, the preliminary remarks did not include clear and emphatic instructions that the jurors were to decide the issues only on

---

[5] This instruction pertained to the lead story that appeared in the *Asbury Park Press* that morning, which focused upon the emergency room at defendant CMC.

evidence presented in open court. *Jasuilewicz, supra,* 205 *N.J.Super.* at 567, 501 *A.*2d 583 (citing *Allen, supra,* 73 *N.J.* at 145, 373 *A.*2d 377; *Williams I, supra,* 93 *N.J.* at 69, 459 *A.*2d 641). The jurors were only instructed not to discuss the case with family members. Cautionary instructions were not given at the conclusion of any of the daily sessions nor before the thirteen-day recess. Finally, during the charge conference held prior to the jurors' return, plaintiff's counsel requested an inquiry into whether jurors had been exposed to outside influences during the recess:

> MR. DRAZIN: Would—would you make sure that in that week none of them have been subjected to any influences from media or going to their doctors' offices and being asked to sign a—
>
> THE COURT: If you're asking me whether I'm going to voir dire the jury, I don't think so. I'm not. I instructed them in the past.[6] I take it that they are. If there's some indication that, perhaps, they may have, then that's something else if it's brought to my attention.
>
> MR. DRAZIN: How would we know that?
>
> THE COURT: You wouldn't.
>
> MR. DRAZIN: Right.

 The nature and frequency of any cautionary instruction will often depend upon the attendant circumstances, including whether the publicity is specifically related to the trial itself or may involve an issue, as in this case, that may indirectly have the capacity to prejudice a party's right to a fair trial. At a minimum, however, appropriately worded cautionary instructions are required in every case where potential exposure to adverse publicity is apparent. *See Bey I, supra,* 112 *N.J.* at 84–85, 548 *A.*2d 846. Moreover, where a trial is not conducted over consecutive trial days and is recessed for a considerable period of time, upon the jury's return, and especially upon the request of counsel, the judge should make inquiry into whether there have been any events that

---

6 We understand the judge genuinely, but incorrectly, believed at that time that he had initially given cautionary instructions, and therefore concluded no further instructions were warranted. Under certain situations, depending upon the nature of the instruction, one instruction may indeed be sufficient. See *State v. Vann,* 976 *S.W.*2d 93, 115 (Tenn.1998), *cert. denied,* 526 *U.S.* 1071, 119 *S.Ct.* 1467, 143 *L.Ed.*2d 551 (1999).

have occurred that may have affected the jurors' continued ability to serve fairly and impartially. *See State v. Bisaccia,* 319 *N.J.Super.* 1, 14–15, 724 *A.2d* 836 (App.Div.1999).

The threatened closure of CMC's emergency room and impending doctor's strike had the potential to significantly impact the community from which the jurors were drawn. Articles were published that detailed how the high cost of litigation could have dramatic consequences on the level and cost of medical care. The impact of litigation costs upon health care was of such significance, it found its way into the President's State of the Union Address two days before the trial commenced. Under these specific facts, the judge had an affirmative obligation to take the necessary prophylactic measures to insulate the jury from the outside influences. *See R.D., supra,* 169 *N.J.* at 558, 781 *A.2d* 37. Very simply, the judge should have instructed the jury to avoid any publicity related to the strike or controversy.

Complete insulation from extraneous influences may not be achieved. *Williams I, supra,* 93 *N.J.* at 62–63, 459 *A.2d* 641. Nonetheless, cautionary instructions provide a mechanism through which trial judges can attempt to minimize exposure to extraneous influences. *Ibid.* Although jurors are presumed to follow instructions given by the trial judge, that presumption contemplates that appropriate instructions are in fact given. *See State v. Gosa,* 263 *N.J.Super.* 527, 537–38, 623 *A.2d* 301 (App.Div.), *certif. denied,* 134 *N.J.* 477, 634 *A.2d* 525 (1993). In this case, the failure to appropriately instruct the jury had the clear capacity to deprive plaintiff of a fair trial and warrants reversal irrespective of whether the jurors were actually exposed to extraneous influences. *R.D., supra,* 169 *N.J.* at 558, 781 *A.2d* 37. *See also Bey I, supra,* 112 *N.J.* at 84–85, 548 *A.2d* 846. We cannot presume, without appropriate cautionary instructions, that the jurors were not exposed to information which may have affected their consideration of the matter. *Id.* at 90–91, 548 *A.2d* 846.

In light of our disposition, we will not address most of the plaintiff's remaining arguments. Because of the possibility of retrial, however, we add the following comments.

Considerable evidence was presented related to plaintiff's failure to follow up with his private physician after being discharged from the emergency room on March 11, 1997, and his continued non-compliance with medical advice thereafter. This evidence implicated the doctrine of avoidable consequences, otherwise characterized as the duty to mitigate damages. *Russo Farms, Inc. v. Vineland Bd. of Educ.*, 144 *N.J.* 84, 108, 675 *A.*2d 1077 (1996). The doctrine is based on the premise that a plaintiff who suffers an injury as the proximate result of a tort cannot recover for any portion of the harm that he or she could have avoided by the exercise of ordinary care. *Ostrowski v. Azzara*, 111 *N.J.* 429, 437, 446–47, 545 *A.*2d 148 (1988). The doctrine "limits consideration of a plaintiff's fault to the time period that begins *after* a defendant's wrongful conduct." *Del Tufo v. Twp. of Old Bridge*, 147 *N.J.* 90, 120, 685 *A.*2d 1267 (1996).

The doctrine of avoidable consequences is applicable to medical malpractice claims. *Ostrowski, supra*, 111 *N.J.* at 432–35, 545 *A.*2d 148. The underlying rationale is that once a patient comes under a physician's care, the law can justly expect the patient to cooperate with the physician in their mutual interests. *Id.* at 445, 545 *A.*2d 148.

While we conclude there was no error in admitting the evidence related to plaintiff's post-discharge conduct, and that the judge properly instructed the jurors on the doctrine as it applied to plaintiff's damages claims, the judge's instructions failed to inform the jury that comparative negligence was not an issue in the case or to explain the limited relevance of the evidence of plaintiff's post-treatment conduct. *Ibid.* In light of our disposition, we need not decide if the jury charge had the clear capacity to cause an unjust result. *See State v. Stevens*, 115 *N.J.* 289, 309, 558 *A.*2d 833 (1989). On retrial, however, appropriate limiting instructions

related to plaintiff's post-treatment conduct must be given. *See Ostrowski, supra,* 111 *N.J.* at 432–35, 545 *A.2d* 148.

Next, plaintiff contends the trial court erred in failing to qualify Dr. Michael Golding as an expert in emergency medicine. Defendants urged the court to reject his qualifications due to his limited experience in emergency medicine. The judge reserved decision but permitted Dr. Golding to testify as to the appropriate standard of care for emergency medicine and defendant Chung's alleged deviation from that standard. The judge, however, never expressly qualified Dr. Golding as an expert.

The evidence related to Dr. Golding's qualifications established that he was well-versed in the general practice of medicine, had completed an emergency room rotation during his surgical residency, had been retained to evaluate the necessity of admitting diabetic patients who presented to the emergency room, assisted with the development of emergency room protocols in his capacity as a surgeon and medical professor, and provided instruction regarding emergency room protocols as a medical professor. The jurors heard sufficient testimony regarding Golding's background to permit them to determine the weight, credibility and probative value of his opinions related to emergency medicine. The judge therefore appropriately rejected defendants' objection to Golding's qualifications, and should have expressly stated that he was being permitted to testify as an expert.

Finally, plaintiff contends the trial court erred when it refused to give an adverse inference charge due to the failure of defendants CMC and Chung to produce Mary Gleason, the triage nurse who evaluated plaintiff when he first presented to the emergency room on March 11, 2003.

"Generally, failure of a party to produce before a trial tribunal proof which, it appears, would serve to elucidate the facts in issue, raises a natural inference that the party so failing fears exposure of those facts would be unfavorable to him." *State v. Clawans,* 38 *N.J.* 162, 170, 183 *A.2d* 77 (1962). For an inference

to be drawn from the non-production of a witness, the witness must be "within the power of the party to produce" and the proffered testimony must be "superior to that already utilized in respect to the fact to be proved." *Id.* at 171, 183 *A.*2d 77. *See also Witter by Witter v. Leo,* 269 *N.J.Super.* 380, 391–92, 635 *A.*2d 580 (App.Div.1994), *certif. denied,* 135 *N.J.* 469, 640 *A.*2d 851 (1994).

The notice in lieu of subpoena was served thirty days in advance of trial. CMC never responded to this notice until the day of trial, at which time CMC's counsel advised plaintiff's counsel that Gleason would not be produced because she no longer worked for CMC and was no longer in the state. Plaintiff's counsel sought an adverse inference charge, which the court declined to give based upon its determination that CMC no longer had any control over Nurse Gleason.

The condition of plaintiff's left foot at the time he arrived at the emergency room on March 11, 2003, was a contentious issue during the trial. Nurse Gleason's entries in the hospital record indicate that plaintiff presented with "purulent drainage" in the left foot, a fact that defendant Chung denied. He testified that had plaintiff presented with "purulent discharge," he would have contacted plaintiff's doctor to admit plaintiff or to come to the hospital to examine plaintiff. In addition, albeit without objection, the court permitted defendant Chung to explain what Nurse Gleason meant in the entry. According to defendant Chung, the nurse probably did not actually observe this condition, but instead was simply reporting what plaintiff probably told her. Defendant CMC also produced a second nurse who examined plaintiff in the emergency room, Janet Maruca. Her notes did not reflect any observation of "purulent discharge," and she testified, had she observed this condition, she would have noted that fact in her entries. Had Nurse Gleason testified, she may have confirmed that she actually saw purulent drainage. If so, the jury may have found that her testimony was superior to both defendant Chung and Nurse Maruca. *See Clawans, supra,* 38 *N.J.* at 171, 183 *A.*2d

77; *State v. J.Q.*, 252 *N.J.Super.* 11, 40, 599 *A.*2d 172 (App.Div. 1991), *aff'd,* 130 *N.J.* 554, 617 *A.*2d 1196 (1993).

In advance of retrial, plaintiff is entitled to receive from defendant CMC the last known address and any other information CMC may possess relative to Nurse Gleason's whereabouts. *McKenney v. Jersey City Med. Ctr.*, 167 *N.J.* 359, 371–72, 771 *A.*2d 1153 (2001) ("Lawyers have an obligation of candor to each other and to the judicial system, which includes a duty of disclosure to the court and opposing counsel") (citing *Kernan v. One Washington Park Urban Renewal Assocs.*, 154 *N.J.* 437, 461–67, 713 *A.*2d 411 (1998) (Pollock, J., concurring)). If plaintiff is unable to locate and depose the witness, the court should conduct proceedings pursuant to *R.* 1:2–4 to determine whether any sanctions should be imposed for CMC's failure to provide a timely response to the notice in lieu of subpoena. At oral argument, CMC suggested that had plaintiff deposed Nurse Gleason, her testimony would have been preserved. That may be true. On the other hand, a decision not to depose a witness may have been a strategic choice and premised on the belief she was still employed by defendant CMC. The fact that Nurse Gleason was not deposed in advance of trial is but one factor the court should consider in determining what relief, if any, should be granted to plaintiff by virtue of the defendant CMC's untimely response to the notice in lieu of subpoena. *Gonzalez v. Safe & Sound Sec. Corp.*, 185 *N.J.* 100, 115–16, 881 *A.*2d 719 (2005). *See also* Pressler, *Current N.J. Court Rules,* comment 1 on *R.* 1:9 (2006); *R.* 1:2–4. In that regard, the court should reconsider whether Nurse Gleason was beyond the power of defendant to produce. *Clawans, supra,* 38 *N.J.* at 171, 183 *A.*2d 77. *See also State v. Maben,* 132 *N.J.* 487, 496–98, 626 *A.*2d 63 (1993); *Avis Rent–A–Car, Inc. v. Cooper,* 273 *N.J.Super.* 198, 202–03, 641 *A.*2d 570 (App.Div.1994).

Reversed and remanded for retrial.